# EXHIBIT D

# bank leumi USA



# INTERNATIONAL ACCOUNT TERMS

**Revision 12/00**

## ARTICLE I—GENERAL TERMS AND CONDITIONS

**Introduction -** These are the "International Account Terms" referred to in the International Account Application. The International Account Terms, the International Account Application (the "Account Application"), the International Fee Schedule (the "Fee Schedule"), the Funds Availability Disclosure, and all account opening documentation together constitute our agreement with you governing your accounts with us administered through the International Division, including accounts with our International Banking Facility or Grand Cayman Branch. There are additional provisions relating to specialized accounts which you specifically request that we open for you. Those additional provisions are set forth in materials provided to you upon opening those specialized accounts. In signing the Account Application, you indicated you (i) received a copy of, and agreed to, the International Account Terms, and (ii) received the International Fee Schedule and the Funds Availability Disclosure.

The Account Application may refer to "BLTNY." All such references will mean Bank Leumi USA.

"Agreement" means the Account Application and these International Account Terms including any Optional Account Provisions selected by you on the Account Application.

"You," "your," and "yours" mean, jointly and severally, each and every individual or entity signing the Account Application as a "Customer."

"We," "us," "our," "ours," "Bank," and "Bank's" mean Bank Leumi USA and its successors and assigns.

Any term used in this Agreement that is defined in the New York Uniform Commercial Code (the "UCC") and not otherwise defined in this Agreement will have the meaning described in the UCC.

**Foreign Status -** Under penalties of perjury, each of you certify that you are (i) not a United States citizen or resident, or (ii) are acting on behalf of a foreign (non-U.S.) corporation, partnership, unincorporated association, estate, or trust. Under current law, this foreign status certification may be used by us during the calendar year in which it is received and during the next two calendar years. However, you agree to recertify to us your foreign status, on an Internal Revenue Service Form W-8 or another form used by us for that purpose, at any time upon our request. If we do not receive a timely recertification, interest paid may be reported to the Internal Revenue Service and we may be required to withhold 31% of the interest paid. Claims for the refund of interest withheld and transferred by us to the Internal Revenue Service must be submitted directly to the Internal Revenue Service.

You are a U.S. resident, and cannot provide a foreign status certification, if you have an immigrant visa (a "green card").

You also cannot provide a foreign status certification if you are physically present in the United States on at least (i) 31 days during the current calendar year, <u>and</u> (ii) 183 days during the current calendar year and the two preceding calendar years (counting all days of physical presence in the current calendar year, 1/3 the number of days of physical presence in the first preceding year, and 1/6 the number of days of physical presence in the second preceding year). However, do not count the days of temporary physical presence in the United States because of (i) diplomatic status, or a visa that represents full-time diplomatic or consular status, (ii) full-time employment with an international organization, or (iii) membership in the immediate family of an individual described in (i) or (ii). Also, do not count the days of temporary physical presence in the United States as a teacher or trainee under

1

a "J" visa (other than as a student), or as a student under an "F," "J," or "M" visa, who substantially complies with the requirements of the visa.

Unless your relation with us is solely on behalf of a foreign (non-U.S.) entity, you agree to notify us, in writing, within 30 days of your becoming a U.S. resident or a U.S citizen.

Under current law, if you are not a United States citizen or resident and the funds in your account are not connected with the conduct of a trade or business in the United States, interest paid on your account is exempt from United States federal, state, and local income taxes, and we will not withhold any taxes from interest accrued on your account.

**Requests for Specific Accounts -** You may request orally (in person or by telephone) or in writing that we establish one or more accounts for you from time to time with our New York Head Office, or our International Banking Facility or Grand Cayman Branch. Upon your request, we will inform you which accounts are available to you at those locations.

**Confidentiality -** Information concerning your accounts will be kept confidential, unless you give us permission to give out any information or we are required to do so to comply with any United States or foreign law.

**Mailing of Account Information -** Unless you choose the Hold Mail Provisions, we will mail any statements, notices, correspondence, and any other documents related to your accounts to your mailing address set forth in the Account Application. You agree to promptly notify us, in writing, of any change in your address or any other changes you wish to make affecting your account.

**Fees, Charges, and Penalties -** We have the right to deduct from your accounts all fees, expenses, charges, and penalties incurred in connection with your accounts, including our fees in connection with compliance with any restraining order or other legal process. You will pay us a processing fee for any legal process requiring us to restrain funds in, or pay funds from, your accounts. This fee is indicated on our Fee Schedule. In addition, if the legal process requires us to produce information or documents concerning your accounts, you will reimburse us for reasonable processing costs to produce the required information or documents, and for any attorney fees and disbursements incurred by us related to the legal process. We may charge any of these fees and expenses to your accounts or collect them from you directly, even if your account(s) is/are closed. We will promptly attempt to notify you concerning any legal process, unless the legal process compels us not to notify you.

**Signatures -** You warrant that your signature(s) on the Signature Card(s) for your accounts is/are your authorized signature(s). We are not liable for refusing to honor your check or other signed instruction if we believe in good faith that the signature(s) appearing on the document is/are not authentic. You may authorize the use of a facsimile signature device by designation on the Signature Card(s) and, in the case of Corporate, Partnership, or Unincorporated Association accounts, on a separate form used by us for that purpose. If you authorize the use of a facsimile signature device, we may honor a check or other signed instruction that appears to bear your facsimile signature(s), even if it was made by an unauthorized person or with a counterfeit facsimile signature device.

**Personal Accounts -** An individual may establish a personal account either in his or her own name or as follows:

<u>"In Trust For" Account</u> - One or more individuals may establish an "in trust for" account (an "ITF Account") for one or more individuals or entities who are the designated "beneficiary" or "beneficiaries". Upon the death of an individual ITF Account owner or all joint ITF Account owners, the account balance will be paid to the surviving beneficiary or in equal shares to the surviving

2

beneficiaries.  If there is no surviving beneficiary, the account balance will be paid, in the case of an individual ITF Account, to the estate of the individual ITF Account owner or, in the case of a joint ITF Account, to the estate of the most recently deceased ITF Account owner.  Before we pay the account balance to the surviving beneficiary or beneficiaries, the estate of an individual ITF Account owner, or the estate of the most recently deceased ITF Account owner, we may require a tax waiver from the New York State tax authorities.  We may also require a Federal Transfer Certificate.

     <u>Joint Account</u> - Two or more individuals may establish a "joint" account (a "Joint Account").  Unless the Account Application or Signature Card specifies that more than one signature is required, each individual may withdraw money from, or pledge for the obligations of any party, or borrow against the Joint Account, without the consent of the other Joint Account owners, including a withdrawal of the account balance.  However, we may, in our discretion, require all Joint Account owners to consent in writing to any withdrawal.  If the Account Application or Signature Card specifies that more than one signature is required, a withdrawal of money from, or a pledge for the obligations of any party, or a borrowing against the Joint Account, requires the signature of the specified Joint Account owners.  If a Joint Account owner dies, the surviving individual(s) will own the balance in the account.

     The funds in a Joint Account become the property of each owner as joint tenants and we may pay the Joint Account to any Joint Account owner during the lifetime of all Joint Account owners.  We may honor withdrawal or pledge requests from any Joint Account owner during the lifetime of all Joint Account owners.  This paragraph does not apply if the Account Application or Signature Card specifies that more than one signature is required.

     We may honor withdrawal or pledge requests from the survivor(s) after the death of a Joint Account owner even if the Account Application or Signature Card specifies that the deceased's signature is required.  We may require a tax waiver from the New York State tax authorities.  We may also require a Federal Transfer Certificate.  We may treat the Joint Account as the sole property of the survivor(s) after the death of a Joint Account owner.  Upon the death of a Joint Account owner, the survivor(s) agree to immediately notify us thereof.

     We will not be liable to a Joint Account owner for continuing to honor withdrawal or pledge requests from a Joint Account owner unless we receive in the International Customer Service Department a written notice signed by a Joint Account owner not to pay or deliver the Joint Account.  After receipt of such notice, we may require written authorization of all Joint Account owners for any further payments or deliveries.

     We may be required by service of legal process to remit funds held in a Joint Account to satisfy a judgment against, or other debt incurred by, that Joint Account owner or another Joint Account owner.

     Any Joint Account owner may request us to (i) stop payment on a check drawn on the account, whether or not the person making the request to stop payment signed the check, and (ii) cancel a stop payment request, whether or not the person making the request to cancel made the request to stop payment.

     **Death of Account Owner -** If the sole owner of a personal account dies, before we pay the account balance to the estate we require a certified copy of the death certificate and of a court certificate showing the appointment of a representative of the estate (<u>e.g.</u>, executor or administrator).  However, if no representative of the estate has been appointed, to the extent allowable under New York law upon receipt of an affidavit on a form used by us for that purpose we may pay certain modest amounts to a surviving spouse, to certain other relatives, or to certain distributees.  In the case of the death of the sole owner, or of any joint owner, of a personal account, we may require a tax waiver from the New York State tax authorities.  (We do not require a tax waiver in the case of a joint personal

3

account where the surviving spouse and the deceased joint owner are the only joint owners of the account.) We may also require a Federal Transfer Certificate.

**Business Accounts -** A corporation or other business entity may establish a business account. You will be required to provide appropriate documentation to establish the authority for opening the account and to certify the names and signatures of the authorized signatories.

**Accounts Designated by Number or Otherwise -** Upon request, we may, in our discretion, open and maintain accounts on your behalf which are designated by number or otherwise, including accounts designated by a trade name. If we do open such an account, you will hold us harmless against claims and expenses (including our reasonable attorney costs) arising out of your account, including those resulting from our failure, upon your request, to comply with the normal and usual banking procedures relating to the maintenance and operation of your account. In addition, you will be liable for all obligations of your account to the same extent as if your account were maintained under your name. If the account is maintained under a trade name, we may require documentation such as a "business certificate" that you are authorized to use the trade name.

**Right of Set-Off -** If you are indebted to us at any time, we have the right, without advance notice to you, to apply, or not allow you to withdraw, so much of the account balance as may be necessary to satisfy the debt, even if your account is a Joint Account and only one Joint Account owner is not indebted to us.

**Enforcement of Obligations -** You will reimburse us for all expenses incurred by us (including our reasonable attorney costs) in connection with our enforcement of your obligations under this Agreement.

**Closing Accounts -** Except for time deposit accounts, we may at any time without advance notice to you close your accounts. For accounts that may be accessed by check, we will normally provide one month's advance notice, but we may in our discretion in extraordinary circumstances close accounts that may be accessed by check without advance notice to you. If we do close your account, we will mail you a check for your account balance (including accrued interest on interest-bearing accounts) to your last known address shown on our records.

We reserve the right not to renew your time deposit accounts. If we exercise this right, we will mail you notice before your time deposit account matures.

**Account Statement; Errors; Forged or Altered Checks or Other Payment Orders -** We will send you an account statement shortly after the end of each monthly statement period. However, if you request in the Account Application or on a form used by us for that purpose that account statements be prepared quarterly, we will send you an account statement at three-month intervals. It is your duty to promptly examine the account statement. If you believe that the account statement contains an error, you agree to notify us in writing within 30 days after the date of the statement. If you do not notify us within that time period, the account statement will be considered correct and binding on you. If your account is a personal account and the error contains an electronic transfer, the notice of error must be received by us no later than 60 days after we sent you the first account statement on which the error or the problem appeared.

No legal proceeding or action may be brought against us to recover payment of

(i) a check, or other payment order, which was not signed or otherwise authorized by you or which was altered, or

(ii) a check which was not endorsed by a payee,

4

unless

(i) in the case of a check, or other payment order, which was not signed or otherwise authorized by you or which was altered, we receive the written notice indicated in the preceding paragraph within the prescribed time period,

(ii) in the case of a check which was not endorsed by a payee, we receive written notice within six months after the date of the statement, and

(iii) the legal proceeding or action is commenced within one year (one and one-half years in the case of an unauthorized endorsement) after the date of the statement.

**Inactive Account -** If we do not have contact with you within a five-year consecutive period, all funds in the account will be transferred to the Comptroller of the State of New York as prescribed in the Abandoned Property Law governing the account.  You may reclaim these funds by contacting the Unclaimed Property Office of the Comptroller of the State of New York.  Excluded from this provision are deposits in and other amounts payable by our Grand Cayman Branch or payable in a foreign currency.

**Stop Payment Orders -** We will not be responsible if we pay or certify a check described in a stop payment request (and because of the payment or certification other checks drawn on the account are returned for insufficient or unavailable funds) because the information you gave us is incomplete or incorrect or because the stop payment request is not given at a time and in such a manner as to afford us a reasonable opportunity to act on it before the check is paid.  We will not be responsible if we pay or certify a check more than 14 days after you have orally requested us not to pay it unless within the 14-day period you confirm your request in writing on a form used by us for that purpose.  We will not be responsible if we pay or certify a check more than six months after the request in writing not to pay it unless within the six-month period you renew your request in writing on a form used by us for that purpose.  An instruction received by us through a telephone- or computer-accessed automated account information service provided by us to receive stop payment requests is a "request in writing on a form used by us for that purpose".  We will not be responsible if we pay or certify a check described in a stop payment request (and because of the payment or certification other checks drawn on the account are returned for insufficient or unavailable funds) because the information you gave us is incomplete or incorrect or because the stop payment request is not given at a time and in such a manner as to afford us a reasonable opportunity to act on it before the check is paid.

**Post-Dated Checks -** You agree not to issue postdated checks.  If, however, you do issue a postdated check, we will not be responsible to we pay or certify the check before the stated date of the check.

**Overdraft, Pledge, and Security Provisions (Article IV) -** You agree to the **Overdraft, Pledge, and Security Provisions** beginning on page 12 of this Agreement, and agree that those provisions are a part of this Agreement.

**Investment and Foreign Currency Provisions (Article V) -** If we make certain kinds of investments and/or purchase or sell foreign currencies for you, you agree to the **Investment and Foreign Currency Provisions** beginning on page 17 of this Agreement, and agree that those provisions are a part of this Agreement.  **THE FOREIGN CURRENCY AND INVESTMENT TRANSACTIONS COVERED BY THOSE PROVISIONS ARE NOT DEPOSITS IN BANKS IN THE UNITED STATES AND ARE <u>NOT</u> INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION.**

**New York Head Office Account Provisions (Article VI)** - If you establish a New York Head Office Account with us, you agree to the **New York Head Office Account Provisions** beginning on page 23 of this Agreement, and agree that those provisions are a part of this Agreement.

**IBF and Grand Cayman Branch Account Provisions (Article VII)** - If you establish an International Banking Facility ("IBF") Account or a Grand Cayman Branch Account with us, you agree to the **IBF Account Provisions** beginning on page 24 of this Agreement, and agree that those provisions are a part of this Agreement. **IBF DEPOSITS AND GRAND CAYMAN BRANCH DEPOSITS ARE <u>NOT</u> INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION.**

**Corporate Authority Provisions (Article VIII)** - If you are a corporation or an unincorporated association, you agree to the **Corporate Authority Provisions** beginning on page 25 of this Agreement, and agree that those provisions are a part of this Agreement.

**Partnership Authority Provisions (Article IX)** - If you are a partnership, you agree to the **Partnership Authority Provisions** beginning on page 27 of this Agreement, and agree that those provisions are a part of this Agreement.

**Changing Terms and Conditions** - You agree that we may change the terms and conditions of this Agreement, as well as any fees for your accounts, at any time. We will mail you notice of those changes to your last known address shown on our records. Unless you promptly instruct us in writing to close your account(s), it will mean that you have agreed to the changes indicated in the notice we sent you.

**Telephone and Facsimile Requests** - You may make telephone requests (orally or through facsimile transmission) for transactions or information relating to your accounts. Telephone requests (orally or through facsimile transmission) for transactions may be made by anyone authorized to sign on the account but only to the extent of the authority of such person (the "Initiator") to act in respect of the requested transaction in accordance with this Agreement. We can accept oral telephone requests for transactions only if the Initiator is an individual who is authorized singly to act in respect of the requested transaction or, if not authorized singly, the appropriate individuals needed to act in respect of the requested transaction together make the request. Requests for information may be made by anyone authorized to sign on the account. All oral telephone requests, whether for transactions or information, may, in our sole discretion, be electronically recorded. If a lawsuit ever results from a transaction involving a telephone request, the recording may be used as evidence in court. We may, in our sole discretion, accept or reject a telephone request, whether for transactions or information and whether received orally or through facsimile transmission. We may also ask for further information, or require confirmation in an original writing.

Unless in the Account Application or other original writing you specify "do not verify telephone (oral or facsimile transmission) payment orders," all payment orders within the meaning of Article 4-A of the UCC ("Payment Orders") received orally by telephone may be verified through the following security procedure. An individual giving us an oral telephone Payment Order will call us at the telephone number designated by us from time to time for that purpose. The individual will represent himself as an authorized Initiator by supplying the name of an authorized Initiator. We will then obtain the Payment Order data from that individual; place a telephone call to the authorized Initiator at the telephone number designated by you for that authorized Initiator in the Account Application or other original writing; request to speak to the authorized Initiator; and confirm the Payment Order data with the individual purporting to be the authorized Initiator by obtaining from that individual Payment Order data relating to the amount of the Payment Order, the beneficiary, and the beneficiary's account.

Unless in the Account Application or other original writing you specify "do not verify telephone (oral or facsimile transmission) payment orders," all Payment Orders received through facsimile transmission by telephone may be verified through the following security procedure. A person giving us a facsimile telephone Payment Order will transmit the facsimile to us at the telephone number or deliver the writing to the location designated by us from time to time for those purposes. The person will represent himself as an authorized Initiator by supplying the signature of an authorized Initiator on the facsimile or written instruction. We will then compare the signature on the facsimile or writing with the genuine signature of the authorized Initiator shown on our records; place a telephone call to the authorized Initiator at the telephone number designated by you for that authorized Initiator in the Account Application or other original writing; request to speak to the authorized Initiator (if the authorized Initiator is an individual) or an individual authorized to act for the authorized Initiator (if the authorized Initiator is an entity); and confirm the Payment Order data with the individual purporting to be the authorized Initiator (if the authorized Initiator is an individual) or the individual purporting to act for the authorized Initiator (if the authorized Initiator is an entity) by obtaining from that individual Payment Order data relating to the amount of the Payment Order, the beneficiary, and the beneficiary's account.

An individual making an oral telephone request for non-Payment Order transactions or information relating to your accounts will call us at the telephone number designated by us from time to time for that purpose. A person making a facsimile telephone request for non-Payment Order transactions relating to your accounts will transmit the facsimile to us at the telephone number or deliver the writing to the location designated by us from time to time for those purposes. We may verify the authenticity of the non-Payment Order or information request through your passport/national identity number, your date of birth, or your mother's maiden name, all as provided on your Account Application.

We will not be liable for any action taken or omitted in accordance with the terms of these Telephone and Facsimile Requests provisions, including (without limitation) any action taken or omitted in reliance upon the forged signature of, or the oral instructions of anyone impersonating, you or an authorized Initiator. Upon our complying with these Telephone and Facsimile Requests provisions, you will hold us harmless against claims and expenses (including our reasonable attorney costs) arising out of telephone requests (orally or through facsimile transmission).

**Bank Leumi le-Israel, B.M., as Your Agent -** You appoint Bank Leumi le-Israel, B.M., its officers, employees, agents, and representatives, to act as your agent, upon oral or written instructions from you, to transmit oral or written instructions to us with respect to withdrawals, deposits, transfers, investments, participations or any other activity with us on your behalf. You will hold us harmless against claims and expenses (including our reasonable attorney costs) arising out of this agency relationship.

**Local Financial Intermediary -** A financial intermediary, such as a bank, cambio, or money transmitter, which is located where you reside or do business may be useful in the execution of certain funds transfers relating to your account(s) with us. Upon your request, we or Bank Leumi le-Israel B.M. may suggest financial intermediaries who have provided services to our customers previously and who maintain an account with us. You may, however, use any financial intermediary you wish. The choice of a financial intermediary is yours and not ours. The financial intermediary you choose need not maintain an account with us. We undertake no responsibility for the actions of the financial intermediary you choose, including its failure to perform, even if the financial intermediary is one which had been suggested by us.

**Waiver of Notice of Dishonor and Protest -** You waive presentment, notice of dishonor and protest of any instrument in connection with this Agreement and all other notices or demands whatsoever whether or not related to any instrument.

**Modifications and Waivers -** Any modifications or amendments to this Agreement will be valid only if in writing and signed by us and you unless for a particular modification or amendment it is stated in this Agreement that a writing is not necessary or that a modification may be made by written notice by us to you. We cannot waive any of our rights under this Agreement unless the waiver is in writing. We reserve the right to waive any of the terms of this Agreement in any specific instance, but the waiver will apply only to that instance. You will not be entitled to make any claim against us upon any promise, agreement, or act of any officer or employee of ours that is not in conformity with the terms of this Agreement.

**Notice -** Notices under this Agreement, unless specifically stated otherwise in this Agreement, must be in writing and delivered by regular mail, overnight courier or telephone facsimile and will be considered received five (5) days after being sent by mail or on the day after the overnight package is sent, or the date the telephone facsimile is sent.

**Prior Agreements; Severability; Captions; Binding Effect -** This Agreement completely supersedes and replaces all prior oral or written agreements and understandings regarding the subject matter of this Agreement. All provisions of this Agreement are separate. If one provision is declared unenforceable, it will not invalidate the remaining provisions of this Agreement. The captions used in this Agreement are for reference purposes only and cannot be used to alter the meaning of any of the terms of this Agreement. This Agreement is binding on your heirs, executors, administrators, successors and assigns and all our successors and assigns.

**Governing Law; Jurisdiction; Service of Process - THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE UNITED STATES OF AMERICA.** Any legal proceedings arising from or in any way related to this Agreement may be brought in, and you hereby consent to personal jurisdiction and venue of, any state or federal court located in New York County, New York, U.S.A. You hereby consent to the service of process in any such action, by mailing a copy of such process to you at your last known address shown on our records.

**Waiver of Jury Trial and of Set-Off and Counterclaim - IN ANY LEGAL PROCEEDING OR ACTION RELATING TO YOUR ACCOUNT OR ARISING OUT OF OR RELATING TO THIS AGREEMENT, YOU WAIVE THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO INTERPOSE ANY SET-OFF OR COUNTERCLAIM OF ANY KIND.**

8

## ARTICLE II—HOLD MAIL PROVISIONS (AN OPTIONAL ACCOUNT PROVISION)

By checking Box 1 and writing your initials under the "Hold Mail Provisions" item in the Optional Account Provisions section of the Account Application, you agree to the following provisions and that they are a part of this Agreement:

A.  At your request, we agree that all notices, statements, supporting items, unpaid returned items, advices and other correspondence relating to each of your account(s) established with us and/or with respect to any loan(s), credit, investments and/or other services rendered to you by the Bank, including (without limitation) any account statements, legal notices and other notices that may affect the terms and conditions of (and/or your liabilities under) any of your account(s), loan(s), credit or other services (collectively, the "Account Records"), will be kept in our possession on your behalf until (a) we receive satisfactory written instructions from you to forward them to an address selected by you, or (b) the Account Records are picked-up by you or another individual appointed by you.  Until we receive other written instructions from you and have a reasonable opportunity to act, you or the individual(s) named in this Agreement as your authorized signatory(ies) or attorney(s)-in-fact are the only individuals authorized to pick up the Account Records.  If more than one such individual is named, we may release the Account Records to either or any of them. We may in our discreton keep the Account Records in electronic media.  A document produced from electronic media shall be considered an original.

B.  Any Account Records held by us pursuant to these provisions will be considered to have been delivered to you as of the date shown on those Account Records.  Any period provided by law for you to assert any claim or commence any lawsuit against us regarding any matter relating to your account(s) (including, but not limited to, discrepancies, forgeries or alterations that would have been revealed by, or become readily apparent from, an examination of any Account Records) will be determined from the date shown on those Account Records.

C.  You understand that government authorities may impose requirements from time to time that will need to be acted upon by you.  Any notice of these requirements received and held by us pursuant to these provisions will be considered to have been made available to you from the date shown on the notice.  Examples of the kinds of notices that would require a response from you include notices of the need to complete a Form W-8 tax certification for nonresident aliens to avoid tax withholding, and notices of the need to communicate with us in order to avoid having funds in an inactive account being turned over to the appropriate government authority.

D.  You are asking us to provide this service solely for your convenience.  We will not be liable for the destruction, loss or disappearance of any Account Records if we take reasonable care to avoid this from occurring.  You will have the burden of proving we did not take reasonable care of any Account Records.

We may charge an annual fee for each of the accounts for which this service is provided, by debiting funds from any of your account(s).  We may change the amount of this annual fee without your consent or giving prior notice to you.

We may make copies of any Account Records on microfiche, microfilm or other image recording system, and may destroy the original Account Records upon making a copy.  We may destroy any original Account Records or copies (whether on microfiche, microfilm or otherwise) held by us for more than five years.

9

## ARTICLE III—POWER OF ATTORNEY PROVISIONS
### (AN OPTIONAL ACCOUNT PROVISION)

By checking Box 2 and writing your initials under the "Power of Attorney Provisions" item in the Optional Account Provisions section of the Account Application, you agree to the following provisions and that they are a part of this Agreement:

The individual(s) named and signing as your attorney(s)-in-fact (either in the Account Application or on a form used by us for that purpose) have been appointed by you as your attorney(s)-in-fact to act on your behalf, with full power and authority, in their name and/or in your name, from time to time to: (a) open and maintain any one or more account(s) in your name, individually or jointly, with the Bank in accordance with the terms of this Agreement, and/or purchase, sell, transfer or dispose of (for present or future delivery) foreign currency, moneys, credits, exchange (on deposit or otherwise), securities, participations in and/or assignments of extensions of credit, and/or other investments, and to do all other acts necessary or advisable in connection with the account(s) and/or any of your other property that you could as the owner of the account(s) and/or other property, including (but not limited to) making deposits and withdrawals, signing and endorsing checks, and signing any agreements or documents requested by the Bank in connection with the account(s) and/or other property, including (but not limited to) promissory notes, security agreements, hypothecation agreements, contracts, instruments, guaranties, participation agreements and/or indemnity agreements; (b) borrow money, obtain credit and/or grant or renew any other credit facilities in United States dollars or any foreign currency from, and incur and renew indebtedness to, the Bank either through loans, advances, renewals, extensions or other forms of credit with or without security, and to guarantee, hypothecate or otherwise become contingently liable with respect to any indebtedness, obligations and liabilities of any other person or entity, and to sign any documents or agreements in connection with any borrowing or extensions of credit, including, but not limited to, promissory notes, security agreements, hypothecation agreements, guarantees and other evidence of indebtedness; (c) deliver to the Bank for safekeeping or otherwise and to pledge, hypothecate, mortgage, assign, endorse and transfer to the Bank as security for all or any present or future liabilities, direct or contingent, of your or others to the Bank, any of your property, real or personal, and to execute agreements, instruments or documents that the Bank may require to evidence a security interest granted to the Bank by you; (d) delegate all or any of these powers to one or more sub-attorney(s) and to revoke that delegation and, if any delegation to a sub-attorney is made, the attorney(s)-in-fact named by you will still retain full authority to act under these provisions without the sub-attorney(s); and (e) do any or all other acts that your attorney(s)-in-fact (or any of them) may consider appropriate in furtherance of the powers granted in these provisions, or to otherwise carry out the intent of these provisions.

You permit your attorney(s)-in-fact to act according to these provisions on the terms and conditions, in the manner, and at the time(s) that your attorney(s)-in-fact may decide, all as fully as you might do if you were personally present and acting. You ratify and confirm all that any attorney(s)-in-fact or sub-attorney(s) may do or cause to be done pursuant to the powers you have given to your attorney(s)-in-fact under these provisions.

You permit the Bank to rely upon these provisions unless and until the Bank actually receives written notice signed by you that any of these provisions have been terminated or modified, or the Bank actually receives written notice of your death. Even if you became disabled or incompetent, or you modify or terminate the power or authority of any attorney(s)in-fact or sub-attorney(s), you and your heirs, executors, administrators, representatives, successors and assigns will be and remain bound by and liable for all actions taken by any attorney(s)-in-fact or sub-attorney(s), unless and until the Bank actually receives written notice signed by you informing the Bank otherwise, or the Bank actually

receives written notice of your death.  You, for yourself and on behalf of your heirs, executors, administrators, representatives, successors and assigns, indemnify and hold the Bank, its successors and assigns, harmless from and against any and all lawsuits, proceedings, claims, demands, liabilities, losses, damages, costs and expenses (including, but not limited to, attorneys' fees and disbursements) sustained or incurred by the Bank in connection with or arising from any reliance by the Bank on these provisions or on any action of your attorney(s)-in-fact or any sub-attorney(s).

The form of signature to be used by (each of) your attorney(s)-in-fact, and whether they may act singly or only jointly, is set forth either in the Account Application or on a form used by us for that purpose.  If any attorney(s)-in-fact appoint(s) a sub-attorney, the attorney(s)-in-fact will inform the Bank of that appointment in a signed writing and, at the same time, provide the Bank with an original specimen of the signature of the sub-attorney.

The Bank may at any time or times, at its option and without liability, require written confirmation by you of any documents signed by, or any other acts performed by, your attorney(s)-in-fact or any sub-attorney(s), before relying or acting or further relying or taking action on any such document or action.  The Bank will have no duty to require  this confirmation.  The Bank may also require this confirmation under any circumstance(s) where the Bank, in its sole discretion, considers this confirmation to be desirable.

These provisions and the authority given under these provisions will not affect or be affected by any other power or authority given before or after the date of this Agreement to the same attorney(s)-in-fact (or any of them), unless the Bank is given an original or certified copy of that other power or authority.

## ARTICLE IV—OVERDRAFT, PLEDGE, AND SECURITY PROVISIONS

By your execution of the Account Application you agree to the following provisions and that they are a part of this Agreement:

1. You authorize the Bank, in its sole and absolute discretion, to: (a) create such overdrafts in your account(s) with the Bank as may be necessary to pay any check(s) and/or draft(s) drawn on the Bank by you and/or to make any payment(s) and/or investment(s) on your behalf; (b) permit any drawing(s) on uncollected funds in your account(s); and/or (c) make any other extension(s) of credit to you by crediting your account(s) (each such overdraft, drawing or extension of credit is referred to in these provisions, individually, as an "Overdraft" and, collectively, as "Overdrafts"). The creation and amount of any Overdraft, and the maximum amount of all Overdrafts permitted to be outstanding at any time, will at all times be in the Bank's sole and absolute discretion. The Bank may refuse to create any particular Overdraft for any reason whatsoever, and may terminate these arrangements at any time without consent by or notice to you. Until payment in full to the Bank of all outstanding Overdrafts and related interest, the Bank may keep all related checks, drafts, instruments and/or other papers evidencing any charges to your account(s).

2. a. You agree immediately, upon the Bank's demand, to repay to the Bank, in United States Dollars and in immediately available funds, at the Bank's main office or at any other place in the United States as the Bank may direct, the full amount of any and all Overdrafts, together with interest on those Overdrafts at a rate per year determined by the Bank from time to time in its sole and absolute discretion (the "Interest Rate"), but in no event will the Interest Rate be greater than the sum of (i) the "Maximum Margin" (as defined below), plus (ii) the floating rate of interest designated by the Bank and in effect from time to time as its "Reference Rate", adjusted when the Reference Rate changes. (You confirm that the Reference Rate may not necessarily represent the lowest interest rate charged by the Bank to customers.) Interest will accrue at the Interest Rate from the date of creation of each Overdraft until repayment in full, unless a different rate of interest has been or is agreed upon between the Bank and you in writing. Interest will be computed on the basis of a 360-day year (which results in the payment of more interest than if interest were computed on the basis of the actual number of days in the year). The Interest Rate will not exceed the maximum rate permitted by law.

b. The "Maximum Margin" to be added to the Reference Rate in determining the Interest Rate is the Maximum Margin set forth, from time to time, in the Bank's standard Fee Schedule for international depositors in effect on the date of this Agreement. The Bank may, upon written notice to you, increase the amount of the Maximum Margin to be added to the Reference Rate. The date of any increase will be considered to be the date on which the notice of increase is mailed to you by the Bank. If you do not want to accept any increase in the Maximum Margin, you must repay all Overdrafts and all related interest within thirty (30) days after the date of the Bank's notice. If all Overdrafts and all related interest have not been paid within that thirty (30) day period, the Bank will consider that you have agreed to the new Maximum Margin. Interest will accrue at the Interest Rate with the new Maximum Margin (effective as of thirty (30) days after the date of the Bank's notice) on all outstanding and new Overdrafts until repayment of all Overdrafts in full. The Bank may, in its sole and absolute discretion, at any time and from time to time, without notice to or consent by you, apply an Interest Rate that is less than the sum of the Maximum Margin and the Reference Rate then in effect.

3. If any accrued interest on any Overdraft remains unpaid on the first business day of any calendar month, the Bank on that date is authorized (but not required) to create a new Overdraft in payment of the accrued and unpaid interest, in an amount equal to the aggregate amount of interest then accrued and unpaid on all Overdrafts, and such new Overdraft will constitute an Overdraft subject to these provisions and will then bear interest at the Interest Rate.

12

4. You authorize (but do not require) the Bank to debit any of your account(s) maintained with the Bank, without notice to or consent by you, on any date on which any Overdraft or any other "Liabilities" (as defined below) or related interest is due or is demanded by the Bank, in an amount equal to the unpaid balance of the Overdraft, related interest and/or other Liabilities. The Bank may apply any balance in any of your account(s) to the amount of any unpaid Overdraft, related interest and/or other Liabilities, upon demand and without notice to you, before it honors any checks or other drafts drawn on your account(s), or any other requests by you for the payment of funds from your account(s).

5. The term "Liabilities" means any and all of the liabilities and obligations of you and/or any of you (if there are more than one of you), whether direct or indirect, absolute or contingent, joint, several or independent, secured or unsecured, liquidated or unliquidated, contractual or tortious, for principal, interest, fees or expenses, due or to become due, now existing or arising or incurred in the future, for personal or business purposes, and payable to or held by the Bank for its own account or as agent for another or others, whether created directly, or now or in the future acquired by assignment, participation or otherwise, and whether incurred by you and/or any of you as primary debtor, co-maker, surety, endorser, guarantor or otherwise.

6. You will, at the Bank's request, at any time, sign and deliver to the Bank one or more promissory notes payable to the Bank as evidence of any then existing Overdraft. The note or notes will be in a form and on terms that are satisfactory to the Bank, and will be payable on demand, bearing interest at the Interest Rate. Even if a note is never signed, you will still be obligated to repay in full, on demand, the amount of any Overdraft, with interest at the Interest Rate, and the Bank's records will be conclusive evidence of all amounts you owe at any time.

7. In order to secure the full and prompt payment and performance of any and all Overdrafts, related interest and other Liabilities, you hereby assign, pledge and transfer to the Bank, and grant to the Bank a perfected, first priority security interest in: (a) each and every account and deposit you have now established (or may in the future establish) with the Bank, pursuant to this Agreement or otherwise, and all other present and future obligations of the Bank to you, including, but not limited to, all (i) certificates, confirmations, passbooks and other instruments evidencing the account(s) or any deposits in the account(s), and (ii) moneys now on deposit and hereafter deposited to the credit of the account(s), including (without limitation) all interest now due or hereafter becoming due; (b) all of your personal property (including, without limitation, all money, accounts, general intangibles, goods, equipment, inventory, instruments, securities, documents and chattel paper) which, or any evidence of which, are now in (or at any time in the future is in) the possession or under the control (with a bailee or otherwise) of, or be in transit to, the Bank for any purpose, whether or not accepted for the purposes for which it was delivered; and (c) all book-entry U.S. Treasury Bills and other book-entry securities purchased or acquired for you and maintained in any account(s) at the Bank, which may have a related account at a bank that is a member of the Federal Reserve System or otherwise. All of the preceding property is referred to in these provisions as "Collateral".

8. So long as any Overdraft(s) or any other Liabilities or any related interest remain unpaid, you will not have the right to make any withdrawals from any of your account(s) at the Bank without the Bank's prior written consent. By pledging your account(s) to the Bank, the Bank will have a priority claim to the account(s) over any other person or entity.

9. The Bank may, in its sole and absolute discretion, at any time: (a) transfer to or register in the name of the Bank or any of its nominees, any of the Collateral and, whether or not it is transferred or registered, receive the income and dividends on any Collateral, including (without limitation) stock dividends and rights to subscribe, and to hold this as part of the Collateral and/or apply it as set forth in these provisions; (b) exchange any of the Collateral for other property upon any reorganization,

13

recapitalization or other readjustment made by you and deposit any of the Collateral with any creditors' committee or depositary upon such terms as the Bank may determine; (c) in any bankruptcy or similar proceeding, file a proof of claim for the full amount of the Collateral and vote that claim for or against any arrangement of your debts or with respect to any other matter; (d) make one or more withdrawals from the account(s) as may be required to repay all or any part of any Overdraft; (e) apply any amounts withdrawn to pay any Overdraft(s), interest and/or any other Liabilities, irrespective of (1) the genuineness, invalidity or enforceability of (A) any documents relating to any Overdraft or any other Liabilities, or (B) your liabilities under this Agreement or these provisions, and (2) the existence, validity or value of any Collateral; (f) in the Bank's name or in your name or the name of any other appropriate person, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement which the Bank may consider desirable with respect to, any of the Collateral; (g) extend the time of payment, arrange for payment in installments, or otherwise modify the terms of any Overdraft or any other Liabilities, or release any of the Collateral; (h) contest, pay and/or discharge all liens, encumbrances, taxes or assessments on, or claims, actions or demands against, any of the Collateral, and take all actions and proceedings in the Bank's name or in your name or the name of any other appropriate person in order to remove or contest such liens, encumbrances, taxes, assessments, claims, actions or demands, or refrain from doing any of the these actions, all without affecting your liabilities on any Overdraft or any other Liabilities and the Collateral, and without notice or liability to you and without your consent, except to account for property actually received by the Bank.

10.  You hereby irrevocably appoint the Bank as your attorney-in-fact with authority to:  (a) receive, open and dispose of all mail addressed to you; (b) endorse your name on any instruments that may come into the Bank's possession; (c) sign your name on any assignment or other instruments of conveyance or transfer any of the Collateral; and (d) take all other actions as the Bank may consider appropriate to carry out and enforce these provisions and to exercise the Bank's rights under these provisions and this Agreement.  The Bank will not be obligated to exercise any authority or right granted to it under these provisions and will not be liable for any action taken or omitted or the manner of taking any action, except for its willful misconduct, and in no event will the Bank be liable for consequential damages.  In addition, with respect to book-entry U.S. Treasury Bills, you authorize the Bank to serve as your bailee and agent with respect to the book-entry U.S. Treasury Bills and other book-entry securities, and to take any action and to execute and deliver any documents on your behalf as the Bank considers necessary or desirable in order to perfect the Bank's security interest in those book-entry securities.  You hereby give notice to the Bank (in the Bank's capacity as your bailee and agent) of the Bank's security interest in any book-entry securities held or maintained by the Bank as your bailee and agent.

11.  You represent and warrant that: (a) you have not already assigned or pledged any of the Collateral or any of the proceeds of the Collateral; (b) you are the sole owner of the Collateral and any instruments evidencing the Collateral; and (c) no other person or entity has any claim or right to the Collateral.

12.  You will pay to the Bank all costs and expenses incurred and sums paid by the Bank (including, without limitation, attorneys' fees and disbursements, insurance premiums and sales commissions) in connection with the custody, care, collection, repair, storage or preparation for or any actual or attempted disposition of any of the Collateral, the collection of any proceeds of insurance with respect to the Collateral, the enforcement of the Bank's rights and remedies under these provisions, or otherwise in connection with this Agreement or these provisions.

13.  Upon demand from the Bank at any time that any of the Overdrafts or other Liabilities are outstanding and unpaid, you will promptly assign and transfer to the Bank and grant to the Bank a

14

security interest in additional collateral of a value and character satisfactory to the Bank or make such payment of all or a part of the Overdrafts or other Liabilities as the Bank may require.

14. Upon demand by the Bank for payment of an Overdraft or any of the other Liabilities, or the occurrence of any "default" or "event of default" under or with respect to any of the other Liabilities, then all of the Overdrafts, all related interest and/or all other Liabilities will, at the Bank's sole option, be immediately due and payable, even if any promissory note or other instrument or document states otherwise, and the Bank may: (a) vote any shares of stock or other securities and exercise all or any powers with respect to any stock or securities as if it were an absolute owner of that Collateral; and/or (b) sell any of the Collateral or cause the same to be sold in New York County, New York, U.S.A., or elsewhere, in one or more sales or parcels at such price and on such terms as the Bank may deem advisable, for cash or on credit, for immediate or future delivery, without assumption of any credit risk, at any public or private sale(s) or other disposition(s), without demand of performance (which demand is expressly waived), on at least five (5) days' notice to you (if any notice is required by law) of any public sale or the time after which a private sale or other disposition may be made (which notice you acknowledge is reasonable) and, in connection with any such sale, may grant options and impose reasonable conditions on such sale, and the purchasers of any of the Collateral so sold will thereafter hold the Collateral absolutely free from any claim or right of any kind including any claim you may have in any equity in the Collateral (any such equity being hereby expressly waived and released), and the Bank or any of its nominees or agents may buy at any public sale and if the Collateral is of the type sold in a recognized market, or is of the type which is the subject of widely distributed standard price quotations, at a private sale. In addition to, and notwithstanding any other rights granted by law or these provisions (or any limitations contained herein on any such rights), the Bank will have the right to collect from you any deficiency in any of the Liabilities remaining after any disposition of the Collateral (less all costs, expenses, fees and commissions incurred by the Bank in making such disposition), and will have the rights and remedies with respect to the Collateral of a secured party under the Uniform Commercial Code of the State of New York. You agree that any action taken by the Bank in accordance with these provisions will be considered to be commercially reasonable.

15. Notwithstanding anything to the contrary contained in these provisions, if in the sole judgment of the Bank, any of the Collateral consisting of securities or foreign currency (or any other property denominated in a foreign currency) suffers a substantial deterioration in value, the Bank may, at any time, liquidate (or execute a "forward transaction" on) that Collateral, all without notice to or consent by you, even if the Bank does not make demand for repayment of any Overdraft or interest, and even if none of the other Liabilities are then due and payable. The Bank may, in its sole and absolute discretion, apply the proceeds of this liquidated Collateral or forward transaction to any one or more of the Liabilities, in any order and amount(s) as the Bank may choose, and/or retain the proceeds thereof as additional Collateral under and subject to these provisions.

16. Even though the Bank may be in possession of the Collateral, you will be primarily responsible for the payment in full of the Overdrafts, interest and other Liabilities. You assume all liability and responsibility for the Collateral, and your obligation to pay any Overdraft(s), interest and other Liabilities will in no way be affected or diminished because any Collateral may be lost, destroyed, stolen, damaged, or for any other reason whatsoever unavailable to you or that the value of the Collateral shall decrease.

17. The Bank may, at any time, at its option, apply all or any cash received from the Collateral to the payment, in whole or in part, of principal and/or interest on any of the Overdrafts and/ or other Liabilities, whether or not then due, applying such cash as it shall elect, making rebate of interest or discount to the extent required by law and so as not to make the rate of interest charged unlawful in connection with such application.

15

18.  The Bank may assign and/or transfer to any assignee or transferee of the Overdrafts and/or other Liabilities, any or all of the Collateral and the Bank's rights with respect to the Collateral, and after such assignment or transfer the Bank will have no responsibility with respect to the Collateral which is assigned and/or transferred.  The Bank's assignee or transferee will have all the powers and rights of the Bank with respect to the Collateral assigned or transferred, but the Bank shall retain all rights and powers with respect to any of the Collateral not so assigned or transferred.  You agree not to assert against any assignee or transferee of any of the Overdrafts or any other Liabilities any claims, counterclaims, offsets or defenses that you may have against the Bank.

19.  If any of the Collateral is applied in payment of any of the Overdrafts or any other Liabilities, you will not have the right of subrogation to the Bank's rights in any other Collateral or any right of contribution from the Bank by reason of that application.

20.  a.  You agree that all payments to be made to the Bank on account of any Overdrafts or other loans, advances, extensions of credit and/or other Liabilities, whether for principal, interest or otherwise, will be made without defense, set-off or counterclaim, free and clear of, and without deduction for or on account of, any present or future "Foreign Taxes" (as defined below).  You further agree that, if any Foreign Taxes are required to be withheld from any amounts payable to the Bank, or if the Bank itself is required to pay any Foreign Taxes in connection with such loans, advances or extension of credit or payments made on any of the loans, the Bank may, in its sole and absolute discretion, (i) increase the amounts payable by you to the Bank to the extent necessary to yield to the Bank (after payment of all Foreign Taxes) the full amounts which the Bank would have received had the payments not been subject to Foreign Taxes, (ii) debit any account(s) which may be maintained by you at any office of the Bank, in an amount equal to the required payment for Foreign Taxes, and/or (iii) sell any of the Collateral in accordance with applicable law or clause (b) of paragraph 14.

b.  "Foreign Taxes" means any income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, withholdings or restrictions or conditions of any nature whatsoever now or hereafter imposed, levied, collected, withheld or assessed by any country or government (or by a political subdivision or taxing authority thereof) other than the United States of America or any political subdivision or taxing authority thereof.

c.  Whenever any Foreign Tax is paid by you, as promptly as possible thereafter, you will send to the Bank an official receipt showing payment of that tax, together with such additional documentary evidence as may be required from time to time by the Bank.

21.  No failure on the part of the Bank to exercise, and no delay in exercising, any right under these provisions will operate as a waiver of that right; nor shall any single or partial exercise by the Bank of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies provided in these provisions are cumulative and not exclusive of any remedies provided by law.

16

## ARTICLE V—INVESTMENT AND FOREIGN CURRENCY PROVISIONS

If the Bank makes certain kinds of investments and/or purchases or sells foreign currencies for you, by your execution of the Account Application you agree to the following provisions and that they are a part of this Agreement:

22. <u>Agreement for the Purchase and Sale of Foreign Currencies</u>.

a. You may request that the Bank sell to you and/or purchase from you, in the Bank's sole discretion, foreign currencies, subject to the terms of these provisions. Each contract for purchase or sale of foreign currency (each, a "Contract") will be on such terms as may be agreed upon by you and the Bank at the time the Contract is entered into. Each Contract will be evidenced by a written confirmation issued by the Bank (each, a "Confirmation") which will set forth (i) the amount of foreign currency to be purchased or sold (the "Contract Currency"), (ii) the date the foreign currency is to be delivered (the "Value Date"), and (iii) the amount of United States dollars to be paid for the currency (the "Purchase Price"). The Bank's records of all Contracts will be conclusive and binding upon you.

b. Requests for the Bank to sell foreign currency to you or purchase foreign currency from you may be made in writing or by telephone or facsimile transmission, in accordance with the Telephone and Facsimile Requests provisions of this Agreement.

c. On the Value Date, you will (i) in the case of a sale of currency from the Bank to you, deliver the Purchase Price to the Bank, at which time the Bank will transmit or otherwise deliver the Contract Currency to or for your account as provided in the Confirmation, and (ii) in the case of a purchase of currency by the Bank from you, deliver the Contract Currency to the Bank's correspondent as provided in the Confirmation, at which time the Bank will, within two (2) business days after the Bank's receipt of a tested telex from its correspondent acknowledging the correspondent's receipt from you of the Contract Currency, credit or transmit the Purchase Price to or for your account as provided in the Confirmation. The Purchase Price will be paid in United States dollars, and both the Purchase Price and the Contract Currency will be delivered in immediately available funds. However, neither the Bank nor any of its correspondents will be liable to you for any claims, demands, liabilities, losses, damages, costs or expenses of any nature whatsoever resulting from any delay, mistake, omission, interruption, misdelivery, mutilation or error on the part of any cable, telegraph, mail, wireless or other transmittal company, agency or utility used in transmitting the Purchase Price or the Contract Currency.

23. <u>Agreement for the Purchase and Sale of Financial Assets</u>.

a. You may request that the Bank open and maintain one or more investment accounts (the "Investment Account") for the financial assets you may select from time to time (each, individually, an "Asset" and, collectively, the "Assets"), and that the Bank acquire, hold, and/or dispose of any or all of the Assets pursuant to your instructions, subject to the terms of these provisions. The Bank will open and maintain the Investment Account only if you also maintain with the Bank one or more transaction accounts in United States currency (the "Related Account") in accordance with the terms of this Agreement. Requests and instructions may be made in writing or by telephone or facsimile transmission, in accordance with the Telephone and Facsimile Requests provisions of this Agreement.

b. The Bank is instructed and authorized to acquire in the Bank's name, but for the benefit of your Investment Account and at your sole risk, the Assets selected by you from time to time.

c. You agree that instructions concerning the rollover of maturing Assets must reach the Bank no less than one (1) week before maturity. If the Bank does not receive timely instructions

17

concerning the rollover, the Bank is authorized to determine, at the Bank's sole discretion, whether or not to roll over the Assets.

d. The Bank is instructed and authorized to debit the Related Account to settle for the Assets. If there are insufficient available funds in the Related Account, the Bank may (but is not required to) debit either (i) the Related Account, resulting in use of uncollected funds or in an overdraft, as the case may be, in the Related Account, or (ii) any other U.S. currency, or non-U.S. currency, account you maintain with the Bank. Upon the Bank committing itself to acquires Assets for the Investment Account which acquisition contemplates a debit to an account at settlement, the Bank is authorized (but not required) to place a hold on (1) the Related Account, or (2) if there are insufficient available funds in the Related Account, any other U.S. currency, or non-U.S. currency, account you maintain with the Bank, in each case in an amount equal to the Bank's reasonable estimate of the amount of the prospective debit. Respecting Assets denominated in non-U.S. currencies, the Bank is instructed and authorized to convert funds into and out of the currency in which the Assets are denominated at the Bank's standard exchange rates and for the Bank's customary fees.

e. The Bank will act to protect the confidentiality of the Investment Account, subject to legal requirements and the Bank's contracts with others to provide services to the Bank. The Bank may use one or more agents to provide, among other things, custody services for the Assets. Custody services may include receiving, or searching for, "call" or other notices relating to the Assets held in custody by such agent or others. The Bank will not be liable for the failure of such agent to take appropriate action relating to such notice if such agent was selected by the Bank in good faith. If such agent fails to take appropriate action relating to such notice and you assert a claim against such agent relating to that failure, you will hold the Bank harmless against any claim the agent may assert against the Bank relating to, or arising out of, the claim you assert against such agent.

f. You agree to the following:

(1) The Bank will be acting solely as your agent, and the Assets will be acquired, held, and disposed of at your sole risk. The Bank may contract with others as subagents to provide any or all of the services the Bank will provide under this paragraph 23, as the Bank considers necessary or advisable.

(2) The Bank's only obligation in disposing of the Assets is to pay you the proceeds thereof that have been credited to the Bank in available funds at its New York Head Office, less any applicable fees and expenses.

(3) The decision to acquire, hold, and dispose of the Assets will be made by you following your consideration of the risks involved, including (without limitation) the risks referred to in paragraph 23(f)(4), and you acknowledge that the Bank has made no representations or warranties to you relating to any such risks. You further acknowledge that you are a sophisticated investor able to evaluate the merits and risks of all investments in the Assets and are able to bear the economic risk of these kinds of investments.

(4) The Bank will not be responsible for any depreciation, currency exchange losses, or loss in value of the Assets, except for that actual damages caused solely by the Bank's fraudulent act or willful misconduct. The Bank will not be responsible for any action that it takes according to your instructions or for any action taken by it under the authority given to it under paragraphs 23(a)-(b).

24. Margin for Foreign Currency Transactions.

a. You must have on deposit at the Bank prior to the Bank's acceptance of a Contract, in

18

addition to any other deposits required to be maintained by you under these provisions, this Agreement or otherwise, a sum in United States dollars equal to the percentage of the Purchase Price under the Contract required by the Bank, in its sole discretion, from time to time (the "Original Margin"). If your Original Margin or any sums deposited by you in accordance with paragraph 22 (such sums are called, collectively, the "Maintenance Margin") is on deposit in account(s) with the Bank from which you may make withdrawals on or prior to the Value Date, the Bank may, in its sole discretion, prohibit withdrawals from those account(s) prior to the Value Date of any sums that would reduce the amount on deposit below the amount of the Original Margin and any Maintenance Margin (collectively, the "Margin").

b. If, at any time, the "Adjusted Currency Value" (as defined below) of all of your Open Contracts for the purchase of currency from the Bank falls below an amount equal to the percentage of the aggregate Purchase Price for all currency to be purchased under those Contracts required by the Bank, in its sole discretion, from time to time, you will, immediately after the Bank demands deposit of additional Margin, deposit with the Bank an amount in United States dollars (in immediately available funds) sufficient so that the Adjusted Currency Value will be equal to at least that percentage of the aggregate Purchase Price. The "Adjusted Currency Value" of all of your Open Contracts for the purchase of currency from the Bank will be the sum of (i) the value from time to time of the currency that is the subject of the Contracts, based upon the then remaining term of each Contract and the Bank's prevailing rate for such currency in New York City (the "Currency Value"), (ii) the Original Margin deposited with respect to these Contracts, (iii) all Maintenance Margin deposited with respect to these Contracts, and (iv) the amount of profit, if any, payable by the Bank that you may earn from time to time on Closed Contracts, and any Margin you have deposited on account of those profitable Contracts.

c. If, at any time, the total "Adjusted Purchase Price" (as defined below) for all currency to be purchased by the Bank from you under all Open Contracts falls below the percentage of the total Currency Value of all currency to be purchased under all your Open Contracts required by the Bank, in its sole discretion, from time to time, you will, immediately after the Bank demands deposit of additional Margin, deposit with the Bank a sum in United States dollars (in immediately available funds) sufficient so that the total Adjusted Purchase Price will be equal to at least that percentage of the total Currency Value. The total "Adjusted Purchase Price" for all currency to be purchased by the Bank from you under all Open Contracts will be the sum of (i) the Purchase Price for all currency to be purchased from you under Open Contracts, (ii) the Original Margin deposited with respect to all Open Contracts, (iii) all Maintenance Margin deposited for all Open Contracts, and (iv) any amount payable by the Bank for any profits you may earn from time to time under Closed Contracts, and any Margin you have deposited on account of those profitable Contracts, if the Margin is not included under paragraph 24(b).

d. If, at any time, your net losses on all Closed Contracts is greater than the Margin deposited with respect to those Contracts, you will, immediately after the Bank demands deposit of additional Margin, deposit with the Bank a sum in United States dollars (in immediately available funds) equal to the difference between the Margin and those losses.

e. The Bank may, in its sole discretion, waive the requirement that Margin be deposited and maintained in accordance with paragraphs 24(a)-24(d), and if the Bank does not insist that the Original Margin be deposited before the Bank's acceptance of a Contract, or demand deposit of any Maintenance Margin, or stop any withdrawal of funds prohibited by paragraph 24(a) of these provisions, it will be considered to be a waiver under this paragraph 24(e) only in that instance. If a waiver occurs under this paragraph 24(e), the Bank may at any time after the waiver, in its sole discretion, demand that you deposit the required Margin with the Bank and you agree to make such deposit in United States dollars (in immediately available funds) within (2) days after the Bank makes the demand.

19

f. Instead of demanding any Margin deposit in accordance with paragraphs 24(a)-24(d), the Bank may, in its discretion and without notice to you, consider any funds in any account(s) you maintain with the Bank to be the required Margin, and the Bank may prevent withdrawal of funds from the account(s) in accordance with paragraph 24(a).

g. As used in these provisions, the terms "Open Contract" and "Closed Contract" will have the meanings customarily given to them by the trade in purchasing and selling contracts for the future delivery of currency.

25. Investment Advice; Bank's Liability; Fees.

a. Neither the Bank nor its officers or employees provide investment advice relating to the purchase or sale, pursuant to this Agreement, of foreign currencies or financial assets. Investment advice is available from the Bank only if you enter into an Investment Management Agreement with the Bank and then only in the circumstances provided for in that Investment Management Agreement.

b. The Bank will not be liable for any act or omission of any agent or broker selected by the Bank in good faith in connection with (i) the acquisition, holding, or disposition of the Assets, or (ii) the conversion of funds into and out of the currency in which the Assets are denominated. You understand that any information furnished to you by the Bank in connection with these provisions will be obtained from sources which the Bank believes to be reliable, but that the Bank does not accept any responsibility for the accuracy of such information. The Bank will not be liable for any loss as a result of any action or inaction respecting the Investment Account(s) based on any information furnished to or by the Bank. Except as expressly provided in paragraph 23(f)(4), the Bank will not be liable for damages of any kind for any action or inaction regarding any of these provisions or this Agreement, including (without limitation) incidental, consequential or punitive damages, regardless of their cause or whether the Bank was aware of the possibility of those damages.

c. For transactions made for your account, you agree to pay the Bank monthly, in arrears, the Bank's usual fees as set forth from time to time in the Bank's fee schedule. The Bank may from time to time revise these fees upon notice sent to you. The Bank will also be entitled to payment for all out-of-pocket expenses and all taxes and other liabilities incurred by the Bank in connection with the Investment Account(s), as and when incurred. The Bank may charge the Related Account(s) and/or any other account(s) for all such fees, expenses, taxes, and other liabilities, without prior notice to or consent by you. To the extent the Bank has not been paid by charging the Related Account(s) or other accounts(s), you agree to pay the Bank upon demand for all such fees, expenses, taxes, and other liabilities.

26. Income on Investment Transactions.

The Bank may collect any income relating to the Assets and in its discretion either (a) reinvest the income in the Investment Account in accordance with the terms of these provisions, or (b) quarterly or monthly convert the income into U.S. dollars (if the income is collected in a non-U.S. currency) and transfer the proceeds to the Related Account(s). Upon written notice to the Bank, you may request that the Bank act otherwise than in accordance with this paragraph 26.

20

27. <u>Default.</u>

a. As used in this paragraph 27, the term "Event of Default" shall mean: (i) nonpayment when due or failure in the timely observance or performance of any of your obligations under these provisions, this Agreement, any Contract or any Asset(s); (ii) a decrease in the Adjusted Currency Value of all Open Contracts for the purchase of currency by you from the Bank below the percentage of the total Purchase Price for all currency to be purchased under those Contracts which is specified in the purchase confirmations; (iii) a decrease in the total Adjusted Purchase Price for all currency to be purchased by the Bank from you under all Open Contracts below the percentage of the total Currency Value of all currency to be purchased under the Contracts which is specified in the purchase confirmations; (iv) default in any other indebtedness or guarantee which you or any person having an interest in any Related Account(s) has at any time to the Bank or to any other individual or entity, if that default would enable the Bank or any other individual or entity to accelerate the maturity of that indebtedness; (v) your insolvency or your failure to generally pay your debts as they become due, or the filing of any application for or appointment of a trustee or receiver for you or any part of your property, or the assignment of any of your assets for the benefit of creditors, or the filing of a petition in bankruptcy by or against you (or the commencement by or against you) of any proceeding under any bankruptcy or insolvency law or any other law relating to the relief of debtors, readjustment of indebtedness, reorganization, receivership, composition or extension; (vi) the suspension of your usual business, condemnation or seizure of a substantial part of your property by any governmental authority or court, or your making or sending notice of any intended bulk transfer of your assets; (vii) your death, dissolution, liquidation or other termination of existence, or the adoption of any resolution for your dissolution, liquidation or other termination of your business; or (viii) such a change in your condition or affairs (financial or otherwise) as, in the sole opinion of the Bank, increases the Bank's risk with respect to the performance of your obligations under these provisions or this Agreement.

b. Upon the occurrence of an Event of Default, the Bank may, in its sole discretion, at any time during the continuance of an Event of Default, without notice to you, dispose of any or all of the currency it holds in inventory for sale to you under any or all Contracts, dispose of any or all contracts the Bank has entered into with third parties to purchase or sell currency that is in turn to be sold to or purchased from you under any or all Contracts, enter into contracts with third parties for the purchase or sale of currency that was to be purchased from or sold to you under any or all Contracts, dispose of any or all Assets in the Investment Account(s), and/or take any other actions that the Bank considers appropriate, and the Bank shall have no further obligations or liabilities to you under any Contract, Asset or Investment Account(s), and you shall be liable for all losses incurred by the Bank as a result of any and all fluctuations in the value of currency or Assets between the date each Contract was entered into or Assets purchased and the date action is taken with respect to the Contract or Assets in accordance with this sentence. The amount of these losses will be payable by you to the Bank in United States dollars on demand and will bear interest from the date of demand until payment in full at a rate per annum equal to 3% in excess of the floating rate of interest designated by the Bank and in effect from time to time as its "Reference Rate", and adjusted when the Reference Rate changes, but in no event in excess of the maximum interest rate permitted by law. (You confirm that the Reference Rate may not necessarily represent the lowest interest rate charged by the Bank to its customers.) Upon the occurrence of an Event of Default, and at any time thereafter, the Bank shall have and may exercise, without further notice, with respect to any or all of your obligations and liabilities to the Bank under these provisions and/or this Agreement, a right of set-off and/or banker's lien against and in respect of any of the Contracts, Assets, Investment Account(s), Related Account(s) and/or any other account(s), then or thereafter held by the Bank. Any right of set-off exercised by the Bank shall be considered to have been exercised immediately on the occurrence of an Event of Default, even though the set-off is made or entered on the books of the Bank after that time. All of the Bank's rights and remedies under these provisions shall be in addition to any other rights and remedies which the Bank may have under this Agreement or any other instrument or agreement or as a matter of law or equity,

21

and all of the Bank's rights and remedies shall be cumulative and may be exercised alone or at the same time.

28. Miscellaneous.

a. The Bank will have no liability to you for any failure to fulfill any of its obligations under these provisions as a result of war, insurrection, strikes, government regulations, force majeure or other conditions or causes beyond its control, or for any deduction for taxes, levies, or otherwise from the Assets. If any change in any applicable law or regulation (or any change in the interpretation of any law or regulation by any governmental authority that administers such law or regulation) causes any increase in the direct or indirect cost or expense of the Bank fulfilling any of its obligations under these provisions or this Agreement, or any reduction in any amount received or to be received by it under these provisions or this Agreement, you will promptly reimburse and pay the Bank for the amount of such increased cost or expense or such reduced receipts. If the issuer or any guarantor of the Assets, or a financial institution or other entity in the home country of the issuer or any guarantor of the Assets, does not fulfill its commitments or fulfills them only partially, or if it cannot meet any of its obligations due to bankruptcy, insolvency or other impairment, transfer restriction, expropriation, or foreign exchange control imposed in the home country of the issuer or any guarantor, or in the United States, or otherwise, the Bank's sole obligation will be to assign to you any claim held by the Bank on your behalf. Thereafter, the Bank will be under no obligation to perform any other services relating to such Assets, and the Bank will have no further liability or responsibility to you under these provisions. However, if the Bank does thereafter perform services relating to such Assets, you will reimburse the Bank for its reasonable costs incurred in that respect before you notify the Bank in writing to cease performing such services.

b. Each of the Contracts and Assets will remain subject to all of the terms and conditions of these provisions even if you make an assignment, pledge or transfer of any Contract or Asset or of any of your rights under any Contract or Asset, and you will not be relieved of any obligations under any Contract or Asset or these provisions as a result of any assignment you may make.

c. In connection with the Investment Account(s), you will comply with all applicable laws of the United States, file all applicable reports and returns, and such other information as may be required. If the Bank is required by law to file a tax return, you will pay the Bank a fee to be determined by the Bank based upon the work involved for the Bank's services to prepare and file any return. You understand that the Bank has not provided, and will not provide, any legal or tax advice to you. Furthermore, the Bank has advised you to seek such advice from your attorney, accountant, and/or tax advisor.

d. The Bank may act upon the instruction and authorization of any person authorized to act pursuant to this Agreement. The ownership interest in the Assets will be determined in the same manner as the ownership interest in the Related Account(s).

e. THE INVESTMENT AND FOREIGN CURRENCY TRANSACTIONS COVERED BY THIS ARTICLE (i) ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION, (ii) ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, THE BANK OR ANY OTHER U.S. BANK, AND (iii) ARE SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED.

## ARTICLE VI—NEW YORK HEAD OFFICE ACCOUNT PROVISIONS

If you establish one or more accounts with our New York Head Office, by your execution of the Account Application you agree to the following provisions and that they are a part of this Agreement:

We use the "daily balance method" to calculate the interest on your account(s) that bear interest. This method applies a daily periodic rate to the principal in the account each day. If your account is opened before 3 PM on a weekday (Monday to Friday) that is not a Federal holiday, interest begins to accrue that day, even if the deposit contains non-cash items (for example, checks). Otherwise interest begins to accrue on the next business day.

We do not open accounts with checks drawn on banks outside the United States or with checks that are not payable in U.S. dollars. We send those checks for collection and open the account upon the check being collected.

The following applies to all accounts other than Retirement Time Deposit Accounts: (a) funds are available for withdrawal in accordance with the Funds Availability Disclosure, however, interest begins to accrue on the day of deposit, even if the deposit contains non-cash items (for example, checks); (b) if you make a deposit at a branch (including its ATM) before 3 PM on a business day that the branch is open, we consider that to be the day of deposit; (c) if you make a deposit after 3 PM or on a day that the branch is not open, we consider that the deposit was made on the next "business day the branch is open; and (d) every day is considered to be a business day," except Saturdays, Sundays or Federal holidays.

All checks deposited in your account, or cashed for you, are handled by us as your agent, subject to chargeback or refund if for any reason final payment is not received by us. Any check drawn on us and deposited in your account, or cashed for you, is subject to chargeback or refund if the check is not properly payable.

If you fail to endorse a check that you submit for deposit, we have the right, but are not obligated, to supply the missing endorsement. You will reimburse us for any loss or expense we incur if a deposited check is not endorsed exactly as drawn.

Fees that may be imposed in connection with your account(s) are indicated on our Fee Schedule.

We reserve the right to refuse any deposit to any account. We may exercise this right any time on the day that would be considered the day of deposit, even if we have given you a deposit receipt. If we refuse a submitted deposit and have not told you immediately, we will promptly attempt to notify you by telephone. If we are unsuccessful in contacting you by telephone, we will promptly mail you notice.

We may change the International Account Terms, the Fee Schedule or the Funds Availability Disclosure. We will give you notice of the change. By law, certain changes require advance notice mailed or delivered to you at least 30 calendar days before the effective date. We may given you notice of other changes through posting notice in our branches at least 10 calendar days before the effective date.

23

## ARTICLE VII—INTERNATIONAL BANKING FACILITY AND GRAND CAYMAN BRANCH ACCOUNT PROVISIONS

If you establish one or more account(s) with the Bank's International Banking Facility ("IBF") or its offshore Grand Cayman Branch, by your execution of the Account Application you agree to the following provisions and that they are a part of this Agreement:

29. Accounts established with the Bank's IBF or Grand Cayman Branch ("Non-U.S. Account(s)") will be non-transferable fixed-rate time deposits. Unless the Bank is otherwise notified by you, Non-U.S. Account(s) will automatically be renewed at maturity for the same term at the then prevailing interest rate. No withdrawal may be made from your Non-U.S. Account(s) prior to the final maturity date.

30. If automatic renewal of a Non-U.S. Account occurs, the accrued interest will be added to the principal of the account unless, before the maturity date, you notify the Bank that interest is to be transferred as instructed or credited to another account that you specify.

31. If you notify the Bank that a Non-U.S. Account will not be renewed, before the final maturity date, you must give the Bank instructions as to disposition of all principal and accrued interest in the Non-U.S. Account.

32. Demand for payment of a Non-U.S. Account deposit with our Grand Cayman Branch may be made only at the Bank's Grand Cayman Branch; however, at your request, the Bank's International Customer Service Department will act as your agent to collect the deposit from its Grand Cayman Branch.

33. The Bank may make disclosures of information and/or documents concerning you and/or your Non-U.S. Account(s): (a) if necessary to carry out your request(s), for the protection of the Bank's interests, or for the enforcement of any of the Bank's rights against you; or (b) as may otherwise be required pursuant to applicable governmental, judicial or legal (whether civil or criminal) process or demand, within the United States of America or elsewhere. You hereby consent to and authorize any such disclosure(s) for purposes of the Confidential Relationships (Preservation) Law of the Cayman Islands, the laws of the United States of America and of the State of New York, and for all other purposes.

34. Instructions, notices and communications to the Bank concerning your Non-U.S. Account(s), including (without limitation) your acceptance or renewal of any Non-U.S. Account, and/or the withdrawal or transfer of funds in Non-U.S. Account(s), may be made according to the Telephone and Facsimile Requests provisions contained in this Agreement. As a matter of convenience to you, these requests may be made either directly to the Bank, or indirectly to one of the Bank's representative offices or correspondent banks, which in turn will communicate these requests to the Bank. Requests made by you to one of the Bank's representative offices or correspondent banks will be considered given to the Bank only when actually received by the Bank.

35. It is the policy of the Board of Governors of the U.S. Federal Reserve System that deposits received by international banking facilities (such as the Bank's IBF) from non-depository institution depositors may be used only to support the operations outside the United States of the depositor or of its affiliates located outside the United States, and that extensions of credit by international banking facilities may be used only to finance the operations outside the United States of the borrower or of its affiliates located outside the United States.

24

## ARTICLE VIII—CORPORATE AUTHORITY PROVISIONS

If you are a corporation or an unincorporated association, by your execution of the Account Application you (also referred to below as the "Company") hereby certify to the Bank that the following resolutions: (a) were duly adopted and approved by your board of directors, members, trustees and/or other governing body on the date specified in the Account Application; (b) are in conformity with your certificate of incorporation, articles of incorporation, charter, by-laws and/or other governing document(s) containing the powers, authorities, rules and regulations that govern you, none of which requires or provides for any vote or consent of your members, shareholders or other equity owners or voting members to authorize the adoption of any of these resolutions; and (c) are now in full force and effect:

"RESOLVED, that Bank Leumi USA (the "Bank") is designated as a depository of this company, firm or association ("Company") and the authorized signatory(ies) of the Company named in the Account Application (the "Agreement") between the Company and the Bank, acting singly or jointly as provided in this Agreement, are hereby authorized to open one or more bank accounts from time to time with the Bank in the name of the Company, with such title or titles as such authorized signatory(ies) may designate; and it was further

RESOLVED, that the Bank is authorized to credit the account, or any of the accounts, of the Company with funds, drafts, checks or other property by whomever delivered to the Bank for deposit in the account(s) of the Company, endorsed with the name of the Company by rubber stamp, mechanical, manual or other signature (and any such endorsement by whomever affixed shall be the endorsement of the Company), or otherwise endorsed or unendorsed; and it was further

RESOLVED, that the Bank may accept and/or pay and/or apply any draft, check, instrument or order for the payment of money, or any proceeds thereof, drawn on the Company's account or accounts when signed as required by these resolutions and this Agreement, without limit as to amount, without inquiry, and without regard to the disposition of any such item or the proceeds thereof, and the Bank shall not be liable in doing so even though such item may be payable to the order of a person whose signature appears on the item or any other officer(s), employee(s) or agent(s) of the Company, or such item or any proceeds thereof may be used or disposed of for the personal credit or account of any such person(s), officer(s), employee(s) or agent(s) with the Bank or otherwise or in payment of the individual obligation of any such person(s), officer(s), employee(s) or agent(s) to the Bank, even if the balance of the account(s) shall be sufficient to pay the full amount of such item, check, draft, instrument or order; and it is further

RESOLVED, that the Company may borrow and/or obtain credit from the Bank and grant security interests in any property as collateral for any borrowing or extension of credit by or to the Corporation or any other party on any terms, and the authorized signatory(ies) of the Company, acting singly or jointly as set forth in this Agreement, shall act on behalf of the Company and shall execute and deliver any documents requested in connection with any borrowing or extension of credit by or to the Corporation or any other party, including (but not limited to) promissory notes, guarantees, security agreements, hypothecation agreements, mortgages and subordination agreements; and it was further

RESOLVED, that the Company borrow and/or obtain credit in United States and/or any foreign currency (including, but not limited to letters of credit) and the authorized signatory(ies) of the Company, acting singly or jointly as set forth in this Agreement, are authorized to open deposit accounts in foreign currencies and to purchase, sell, transfer or dispose of, for present and future delivery, foreign currency, moneys, credits, exchange (on deposit or otherwise), securities and/or other investments, and to execute and deliver any agreement or instruments relating to any such transaction,

25

including (but not limited to) the Investment and Foreign Currency Provisions of this Agreement; and it was further

RESOLVED, that the authorized signatory(ies) of the Corporation, acting singly or jointly as set forth in this Agreement, are authorized to direct the Bank to purchase or sell for the account of the Company's stocks, bonds and other securities and investments; and it was further

RESOLVED, that the Company may purchase one or more participations in, or take assignments of, extensions of credit made by the Bank to one or more borrowers, such purchases or assignments being made without recourse to the Bank, except for actions taken by the Bank in bad faith; and it was further

RESOLVED, that the Bank may act upon these resolutions and rely upon the certification of these resolutions as set forth in this Agreement until receipt by it of a certification of the adoption of new authority resolutions purporting to be signed by the Secretary of the Company.  Until the Bank has actually received such certification of new authority resolutions, the Bank is indemnified and held harmless by the Company from any and all lawsuits, proceedings, demands, claims, liabilities, losses, damages, costs and expenses (including, without limitation, attorneys' fees and expenses) suffered or incurred by it in continuing to act according to these resolutions, even though these resolutions may have been changed.  In case the Bank is unsure of the validity of any such certification of new authority resolutions, the Bank may continue to act upon the authority of these resolutions unless and until it is fully indemnified to its satisfaction against all lawsuits, proceedings, demands, claims, liabilities, losses, damages, costs and expenses (including, without limitation, attorneys' fees and expenses) that may arise if the Bank acts according to such new resolutions or amendments.  In addition, under such circumstances, the Bank is authorized to refuse to disburse any funds from any of the Company's account(s), without any liability for items returned by reason of such refusal, unless and until the Bank (a) is fully indemnified to its satisfaction, (b) receives joint instructions from all of the persons claiming to be authorized to sign on behalf of the Company, based upon the existing and any such disputed certification, or (c) is served with an order of a court of competent jurisdiction directing the Bank to act, or not to act, in accordance with such disputed certification; and the Bank shall also, at all times, be authorized (but not required) to bring an interpleader or similar action to determine the proper disposition of the funds in the Company's account(s).  In case of any such dispute or uncertainty, the Bank shall be entitled to be reimbursed for all costs and expenses incurred (including, without limitation, attorneys' fees and expenses, and the other costs and expenses of bringing any legal action and court costs) and shall have the right to deduct all such amounts from the balance of such account(s); and it was further

RESOLVED, that the Company agrees to be bound by all the rules, regulations, conditions, limitations and agreements contained in this Agreement, any signature card, deposit ticket, check book, passbook, statement of account, instrument or other agreement from time to time in effect (each, a "Document") as printed or written on one of the Bank's forms when received (or deemed received) by the Company from the Bank, or delivered to the Bank by the Company, with the same effect as if each and every term and condition were set forth in full in these resolutions and made a part hereof, except that in case of any inconsistency between these resolutions and the terms of any such Document, these resolutions shall control, unless otherwise expressly stated in such Document; and it was further

RESOLVED, that the authorities contained in these resolutions shall supersede and expressly revoke any and all prior certifications to the Bank of resolutions regarding the authority of individuals to sign on behalf of the Company's account(s) with the Bank.

### ARTICLE IX—PARTNERSHIP AUTHORITY PROVISIONS

If you are a partnership, by your execution of the Account Application, you agree to the following provisions and that they are a part of this Agreement:

You (also referred to below as the "Firm") hereby certify to the Bank, as of the date specified in the Account Application, that: (a) the Firm is composed of the general partners (and limited partners, if any) named in the Additional Account Information section of the Account Application; and (b) this Agreement and the following provisions (i) were duly adopted and approved by the Firm on the date specified in the Account Application, (ii) are in conformity with the Firm's partnership agreement and/or other governing document(s) containing the powers, authorities, rules and regulations that govern the Firm, and (iii) are now in full force and effect:

A. The Bank is designated as a depository of the Firm and the authorized signatory(ies) of the Firm named in the Account Application, acting singly or jointly as provided in this Agreement, are hereby authorized to open one or more bank accounts from time to time with the Bank in the name of the Firm, with such title or titles as such authorized signatory(ies) may designate.

B. The Bank is authorized to credit the account, or any of the accounts, of the Firm with funds, drafts, checks or other property by whomever delivered to the Bank for deposit in the account(s) of the Firm, endorsed with the name of the Firm by rubber stamp, mechanical, manual or other signature (and any such endorsement by whomever affixed shall be the endorsement of the Firm), or otherwise endorsed or unendorsed.

C. The Bank may accept and/or pay and/or apply any draft, check, instrument or order for the payment of money, or any proceeds thereof, drawn on the Firm's account or accounts when signed as required by these provisions and this Agreement, without limit as to amount, without inquiry, and without regard to the disposition of any such item or the proceeds thereof, and the Bank shall not be liable in doing so even though such item may be payable to the order of a person whose signature appears on the item or any other partner(s), officer(s), employee(s) or agent(s) of the Firm, or such item or any proceeds thereof may be used or disposed of for the personal credit or account of any such person(s), partner(s), officer(s), employee(s) or agent(s) with the Bank or otherwise or in payment of the individual obligation of any such person(s), partner(s), officer(s), employee(s) or agent(s) to the Bank, even if the balance of the account(s) shall not be sufficient to pay the full amount of such item, check, draft, instrument or order.

D. The Firm may borrow and/or obtain credit from the Bank and grant security interests in any property as collateral for any borrowing or other extension of credit by or to the Firm or any other party on any terms and the authorized signatory(ies) of the Firm, acting singly or jointly as set forth in this Agreement, shall act on behalf of the Firm and shall execute and deliver any documents requested in connection with any borrowing or other extension of credit by or to the Firm or any other party, including (but not limited to) promissory notes, guarantees, security agreements, hypothecation agreements, mortgages and subordination agreements.

E. The Firm may borrow and/or obtain credit in United States and/or any foreign currency (including, but not limited to letters of credit) and the authorized signatory(ies) of the Firm, acting singly or jointly as set forth in this Agreement, are authorized to open deposit accounts in foreign currencies and to purchase, sell, transfer or dispose of for present and future delivery, foreign currency, moneys, credits, exchange (on deposit or otherwise), securities and/or other investments, and to execute and deliver any agreement or instruments relating to any such transaction, including (but not limited to) the Investment and Foreign Currency Provisions of this Agreement.

F.  The authorized signatory(ies) of the Firm, acting singly or jointly as set forth in this Agreement, are authorized to direct the Bank to purchase or sell for the account of the Firm stocks and bonds and other securities and investments.

G.  The Firm may purchase one or more participations in, or take assignments of, extensions of credit made by the Bank to one or more borrowers, such purchases or assignments being made without recourse to the Bank, except for actions taken by the Bank in bad faith.

H.  The Bank may act upon these provisions and rely upon the certification of these provisions as set forth in this Agreement until receipt by it of a certification of new partnership authority provisions purporting to be signed by the general partner(s) of the Firm.  Until the Bank has actually received such certification of new authority provisions, the Bank is indemnified and held harmless by the Firm from any and all lawsuits, proceedings, demands, claims, liabilities, losses, damages, costs and expenses (including, without limitation, attorneys' fees and expenses) suffered or incurred by it in continuing to act according to these provisions, even though these provisions may have been changed.  In case the Bank is unsure of the validity of any such certification of new authority provisions, the Bank may continue to act upon the authority of these provisions unless fully indemnified to its satisfaction against all lawsuits, proceedings, demands, claims, liabilities, losses, damages, costs and expenses (including, without limitation, attorneys' fees and expenses) that may arise if the Bank acts according to such new provisions or amendments.  In addition, under such circumstances, the Bank is authorized to refuse to disburse any funds from any of the Firm's account(s), without any liability for items returned by reason of such refusal, until the Bank (a) is fully indemnified to its satisfaction, (b) receives joint instructions from all of the persons claiming to be authorized to sign on behalf of the Firm, based upon the existing and any such disputed certification, or (c) is served with an order of a court of competent jurisdiction directing the Bank to act, or not to act, in accordance with such disputed certification; and the Bank shall also, at all times, be authorized but not required to bring an interpleader or similar action to determine the proper disposition of the funds in the Firm's account(s).  In case of any such dispute or uncertainty, the Bank shall be entitled to be reimbursed for all costs and expenses incurred (including, without limitation, attorneys' fees and expenses, and the other costs and expenses of bringing any legal action and court costs) and shall have the right to deduct all such amounts from the balance of such account(s).

I.  The Firm agrees to be bound by all the rules, regulations, conditions, limitations and agreements contained in this Agreement, any signature card, deposit ticket, check book, passbook, statement of account, instrument or other agreement from time to time in effect (each, a "Document") as printed or written on one of the Bank's forms when received (or deemed received) by the Firm from the Bank, or delivered to the Bank by the Firm, with the same effect as if each and every term and condition were set forth in full in these provisions and made a part hereof, except that in case of any inconsistency between these provisions and the terms of any such Document, these provisions shall control, unless otherwise expressly stated in such Document.

J.  The authorities contained in these provisions shall supersede and expressly revoke any and all prior certifications to the Bank of provisions regarding the authority of individuals to sign on behalf of the Firm's account(s) with the Bank.

K.  Each of the general partners of the Firm shall be jointly and severally liable for the prompt payment and performance of any and all liabilities and obligations of the Firm to the Bank, and any and all claims of every nature and description that the Bank may have against the Firm, whether now existing or hereafter incurred, originally contracted with the Bank and/or with another or others, in any manner now or hereafter owing to or acquired by the Bank, whether absolute or contingent, secured or unsecured, matured or unmatured.

28