**EXHIBIT L**

## INVESTMENT SERVICES APPLICATION AND AGREEMENT

7/23/02

*[Certain information should be completed on page 8.]*

**1. Agreement to be Bound by this Agreement**

**a. Generally.** Each of the undersigned (hereinafter referred to individually and collectively as "Customer") hereby (i) opens the Investment Account specified below with Bank Hapoalim B.M. (the "Bank") at its office specified below (the "Office"), (ii) requests the Bank (A) to act as Customer's agent and/or (B) to act as principal in effecting Transactions (as defined below) with Customer, pursuant to the provisions of this Investment Services Application and Agreement (the "Agreement"), (iii) adopts and agrees to be bound by the Agreement as such may be amended from time to time, which shall replace and supersede any and all prior agreements, terms and conditions and documents relating to the same subject matter effective retroactively as of the date that the Customer first transferred any assets or funds to the Investment Account, and (iv) confirms the statements and makes the requests and the agreements set forth in the Agreement.

**b. Joint Accounts; Multiple Person Customer.** If Customer is more than one person or entity, (i) each Customer will be fully liable jointly and severally for any amounts due or which become due under the Agreement, but the Bank may sue any or all of them for these amounts, and (ii) all holdings of the Investment Account shall be held as joint tenants with right of survivorship.

**2. Agency Appointment; Authorization to Act as Principal; Services.**

**a. Agency Appointment; Authorization to Act as Principal.** Customer appoints and authorizes the Bank to be Customer's agent, for Customer's account, in connection with all aspects of any and all transactions with any party, including but not limited to (i) purchasing, investing in, trading, transferring, exchanging, converting, redeeming, lending, holding and/or selling any and all securities, commodities, derivatives, instruments, deposits, funds, currencies and any other assets, (ii) borrowing, pledging and/or granting a security interest in any holdings of the Investment Account, (iii) entering into any repurchase, reverse repurchases, swap, exchange or forward agreements or any derivatives transactions, and/or (iv) issuing (writing) options ("Transactions"). (All holdings of the Investment Account, whether assets, liabilities or otherwise, shall be referred to herein as the "Holdings".) As to any Transaction requested by Customer to be effected under the Agreement, Customer also authorizes the Bank in its discretion to enter into any such Transaction as principal rather than as Customer's agent, in which event Customer shall be the Bank's counterparty. The Bank's appointment and authorization as agent and or the Bank's authorization to act as principal will not be affected by Customer's disability, incapacity or incompetency, and shall remain in full force and effect until such time as the Bank receives written notice of its rescission or, if earlier, the termination of the Agreement.

**b. The Bank Acting Directly or Indirectly.** The Bank, when acting as agent or principal under the Agreement, whether directly or indirectly through any agents, brokers, correspondents, custodians, delegees, dealers, employees, futures commission merchants, nominees or representatives ("Agents"), is referred to herein as the "Bank". Any reference herein to the Bank making any decision, entering into any transaction and/or taking or refraining from taking any action shall be understood to refer to the Bank doing so directly and/or through any of its Agents. The appointment of the Bank as Customer's agent may be supplemented by any documents regarding the appointment of an agent required by any Agent, and any Transaction entered into on behalf of Customer may be subject to any requirements and conditions imposed by any Agent.

**c. Account Ownership.** The Bank, as Customer's agent, may maintain a brokerage or other account or accounts directly with one or more Agents or other parties. All such accounts shall be held in the Bank's name and the Customer shall have full beneficial ownership of all holdings therein.

**d. Bank Acting as Agent in any Transaction.** When the Bank acts as Customer's agent, all orders for purchase or sale, as the case may be, of any Holdings shall be executed by the Bank at the then current market price as determined by the Bank (plus or minus, respectively, any applicable sales load, sales charge, commission and/or other fees, if any). Minimum purchase orders, limitations, restrictions, charges, sales loads, sales charges, commissions, other fees and other requirements for Transactions may, at the Bank's option, be as prescribed by any Agent, and Transactions are subject to the provisions of any agreement of the Bank with, and any regulations of, any Agent. All orders will be subject to acceptance or rejection by any Agent in its sole discretion.

**e. Services.** As Customer's agent, the Bank's services may include, at the Bank's option: opening accounts with one or more Agents for the Transactions of the Bank's customers (including Customer); transmitting Customer's information, documents and instructions, as appropriate, to any Agent; transmitting to Customer all communications sent to the Bank for transmittal to Customer by or on behalf of any Agent; effecting payment for, and receiving the proceeds of, Transactions; receiving income from Customer's Holdings; and providing securityholder and administrative services in connection with Customer's beneficial ownership of Holdings, which may include from time to time, but shall not be limited to (A) assisting Customer in changing dividend options, account designations and addresses; (B) performing subaccounting; (C) establishing and maintaining securityholder accounts and records; (D) providing periodic statements and/or reports; and (E) providing such other information and services as Customer and/or any Agent reasonably request, to the extent the Bank is permitted by applicable law.

**f. Transactions with the Bank or any Affiliate.** Customer (i) authorizes the Bank in its sole discretion, on behalf Customer, to enter into any Transactions with any office worldwide of the Bank or of any affiliate or subsidiary of the Bank (any such office being referred to herein as "the Bank or any Affiliate"), including but not limited to the employment of the Bank or any Affiliate as the Bank's Agent, and (ii) ratifies any and all such prior Transactions. **Customer (i) acknowledges that the provisions of this subparagraph may, without Customer's consent, violate the Bank's duty of loyalty to Customer, (ii) consents to, and waives any real or apparent conflict of interest that may result from, any such Transactions, and (iii) waives any right to receive advice thereof.**

### 3. Customer's Indemnification of the Bank

Each Customer hereby expressly releases the Bank and agrees jointly and severally to indemnify, reimburse and hold the Bank harmless from, and agrees that the Bank shall not have any loss on account of or liability for, any and all claims against the Bank and any and all costs, expenses, fees, losses, damages (including loss of income and opportunity costs) or liabilities the Bank might incur, including any legal costs and expenses and any costs and expenses of enforcing the indemnity (collectively "Claims") arising by reason of entering into or performing pursuant to the Agreement, including but not limited to any loss of income or Holdings, any diminution in value of Holdings, any taxes, any disposition, transfer or withdrawal of Holdings, legal fees and brokerage fees.

### 4. Fees, Charges, Set-Off and Payments

**a. Fees.** The Bank shall receive for its services the fees set forth in its schedule of fees in effect from time to time. Customer acknowledges receipt of the Bank's current schedule of fees. In its sole discretion, the Bank may change such fees from time to time. The Bank will endeavor to provide reasonable notice to Customer of any changes to its schedule of fees. In addition, every Transaction and every Holding will be subject to any applicable fees, charges and expenses of any Agent and of any applicable broker, custodian, advisor, portfolio manager, correspondent or other service provider -- including, in the case of securities of any investment company (mutual fund), the fees and other charges of such mutual fund's investment advisor -- even if the service provider or mutual fund investment advisor is the Bank or any Affiliate. In addition, in making any purchase or sale or other Transaction, including foreign exchange transactions, the Bank or any Affiliate and any Agent is authorized to act as principal, agent or broker, and to be separately compensated in that capacity. Customer authorizes the receipt of such compensation referred to in the preceding sentence and waives any special computation or accounting, and may revoke this authorization at any time by notifying the Bank in writing. **Customer (i) acknowledges that the provisions of this subparagraph may, without Customer's consent, violate the Bank's duty of loyalty to Customer, (ii) consents to, and waives any real or apparent conflict of interest that may** result from, incurring and paying any such fees, charges and expenses, and (iii) waives any right to receive advice thereof.

**b. Charges and Set-Off.** Customer shall be, and if there shall be more than one Customer, all Customers shall be jointly and severally, liable for payment of all fees, charges and Claims (collectively "Charges"). Such payment may be effected by charge to the Bank Account (specified below) or any other account maintained by any Customer, individually or jointly, with the Bank or any Affiliate or, in the Bank's sole discretion, by charge to the Holdings of the Investment Account. In the event that there are insufficient funds in such accounts or the Investment Account to pay any Charges, Customer will be billed. The Investment Account shall at all times be subject to the Bank's right of set-off.

**c. Payments from Other Sources.** Customer (i) authorizes the Bank or any Affiliate to receive payments from any Agent or issuer (including any mutual funds or investment companies) whose securities are held by the Investment Account, for services in connection with any Transactions or for providing investment advice and/or administrative or other services thereto, and (ii) ratifies any and all prior receipts of such payments. Any such payments received by the Bank or any Affiliate shall inure to its exclusive benefit, and Customer and the Investment Account shall have no interest therein. **Customer (i) acknowledges that the provisions of this subparagraph may, without Customer's consent, violate the Bank's duty of loyalty to Customer, (ii) consents to, and waives any real or apparent conflict of interest that may result from, the receipt of any such payments by the Bank or by the Bank or any Affiliate, and (iii) waives any right to receive advice thereof.**

### 5. Standard of Care; Limited Liability

**a. Standard of Care.** Subject to the other provisions of the Agreement, the Bank shall exercise the same care and diligence in the safekeeping of the Investment Account's Holdings as the Bank would exercise with respect to the Bank's own holdings. The Bank may exercise any of its powers and perform any duties required of it through any Agent selected by it in its sole discretion based on the Bank's evaluation of, among other factors, the Agent's execution, reporting and other services and pricing. The Bank and its Agents shall be entitled to the advice of counsel, at Customer's expense, concerning all questions relating to the Investment Account, Transactions and the Agreement.

**b. Minimum Size of Transactions.** The Bank may require that Transactions through it shall be conducted in minimum amounts, which may be larger than minimum amounts required by any Agent. Such minimum amounts may be changed by the Bank from time to time by noting such changes on its books and records. Information about the Bank's applicable minimums shall be available to Customer upon request.

**c. Provision of Information and Materials to Customer.** The Bank has provided and/or from time to time may provide Customer with information (such as prices, rates and yields) and/or materials (such as explanatory memoranda,

promotional materials, sales literature, prospectuses and reports) applicable to any actual or prospective Holdings of the Investment Account provided by sources available to the Bank, including any issuer or Agent ("Information Sources"). The Bank makes no representations or warranties whatsoever regarding the merits thereof or of any matter contained in any such information or materials and shall not be responsible for the accuracy or completeness thereof, and Customer agrees to look solely to such Information Sources for responsibility, if any, regarding same. Without limiting the foregoing: (1) any market price or value provided will represent only the opinion of the Bank or of an Information Source as to the price at which an investment can be purchased or sold in the market and may not conform in any way to actual trading prices or information available from other third parties; (2) all prices and other data provided by the Bank are not warranted as to completeness, accuracy or timeliness, and are always subject to change with out notice; (3) any price or market value provided is the price on the last day the investment was priced and will fluctuate with market conditions; and (4) neither the Bank nor any Information Source shall be liable to the Customer in the event that any pricing or other information proves to be inaccurate.

**d. Limited Liability.** The Bank shall not be liable for the exercise of any action, inaction or omission or anything whatsoever in connection with the Investment Account, or for any loss or depreciation in value of the Investment Account's Holdings, unless resulting from the Bank's gross negligence, willful misconduct or bad faith or, if and solely to the extent required by law and not disclaimable, its own negligence. To the fullest extent permitted under applicable law, the Bank shall not be responsible for any act or omission of any Agent of the Bank or of any Information Source or other third-party provider if the Bank used good faith and ordinary care in the selection thereof. In any event, the Bank shall not be liable for any special, consequential or punitive damages. The Bank shall have no liability for any failure or delay to fulfill its obligations under the Agreement or to carry out any of Customer's instructions, as a result of war, insurrection, strikes, government regulations, telecommunications facilities failure, force majeure, or other conditions or causes beyond the Bank's control. The Bank shall not be liable for any errors of fact or judgment so long as it acts in good faith. The Bank does not assume responsibility for losses nor guarantee gains for the Investment Account, and the Bank shall not be liable for any tax consequences occasioned by the Bank taking or refusing to take any action for the Investment Account. In addition, the Bank's agreements with its Agents, Information Providers and other third-party providers may include provisions limiting the liability of such providers to the Bank and/or to the Customer. The Customer agrees to be bound by such provisions, whether or not the Bank provides the Customer with any notice thereof.

**e. United States Taxes.** Customer acknowledges that under certain circumstances Transactions may be or become subject to taxation in the United States. Customer agrees to supply the Bank, any Agent or any issuer with all documentation (including certification of nonresident status, if applicable) as may be required under United States law. Customer further agrees that (i) any amounts required by U.S. law to be withheld from Customer's Holdings, payments from Holdings and income derived from Holdings shall be withheld and paid to the United States Internal Revenue Service or other appropriate authority by the Bank or any Agent or issuer, as required by law, and (ii) the Bank or any Agent or issuer, as appropriate, shall make any returns or reports to or hold them available for the United States Internal Revenue Service or other appropriate authority regarding Customer's Transactions as shall be required by law.

**f. Non-U.S. Transactions.** Customer understands that dealing in non-U.S. markets involves different risks from dealing in the United States markets and that the potential for profit or loss from Holdings in such markets may be affected by fluctuations in foreign exchange rates. Customer understands that a loss in value of such non-U.S. Holdings could occur if there is a devaluation of the currency of the applicable country or if foreign exchange control regulations are imposed in any such country that make it difficult or impossible to convert the currency to U.S. dollars and/or to return any non-U.S. currency to Customer in the United States. The Bank will not be responsible for any such losses or for acting or failing to act with respect to them, so long as the Bank acts in good faith.

**g. Errors in Transactions.** Customer shall, promptly after delivery to Customer, notify the Bank of any errors in any confirmations of Transaction. If the Bank receives no objection within five days after delivery, all such Transactions shall be deemed conclusive and made in conformity with the instructions given and all shall be deemed correct.

**h. No Insurance Against Losses.** The Bank does not undertake to insure Customer or the Investment Account against any losses.

**i. No Bond Required.** No bond or other security shall be required of the Bank or any of its Agents.

**j. Legal Proceedings.** The Bank shall have no obligation to institute or defend any legal, administrative or arbitration proceeding on behalf of the Investment Account, its Holdings, Customer, or Customer's successors and assigns, but the Bank may do so in its discretion, in which event the Bank's legal and other expenses with respect thereto shall be deemed to be additional Charges.

**6. Transfer and Receipt of Funds.**

**a. Customer Instructions.** Each instruction by Customer to the Bank to effect any purchase or sale of on behalf of the Investment Account shall also constitute (whether or not expressly stated) Customer's authorization and direction to the Bank: (i) at the Bank's discretion to debit the Bank Account or to restrict it for the amount of the purchase and any sales load or fees at the time the Office receives Customer's instruction to effect such purchase, (ii) to receive Customer's funds transferred from sources other than the Bank Account, (iii) to hold any amount debited or funds received in a segregated non-interest bearing account for Customer until such time as settlement for the purchase shall be

CONFIDENTIAL

BLUSA-HAPOALIM 00000501

required, and (iv) at the time such settlement is required, to transfer such amount from the Bank Account or such segregated account, as the case may be, by any means reasonably chosen by the Bank, to effect any payment in connection with any such purchase.

    b. **Insufficient Funds.** The Bank shall not be obligated in any manner to effect any purchase at Customer's request beyond the amount of collected funds available in the Bank Account or received from other sources at the time the Bank acts upon the purchase instructions. The Bank may delay acting upon purchase instructions until such time as sufficient collected funds are available for the settlement of any purchase instructions. Nevertheless, the Bank may in its sole discretion, but shall not be obligated to, create an overdraft in the Bank Account to any extent necessary to carry out Customer's purchase instructions. Any such overdraft shall be subject to Customer's obligations to the Bank regarding overdrafts in the Bank Account in accordance with the separate account arrangements governing the Bank Account, including but not limited to the obligation to pay applicable service fees and interest charges. If no such arrangements have otherwise been made with respect to the payment of interest, then Customer hereby agrees to pay the Bank interest thereon at the highest legally permissible rate.

    c. **Receipt of Funds.** Any money received by the Bank for Customer shall be deposited to the Bank Account or transferred in accordance with Customer's instructions, subject to any tax withholding requirements.

    d. **Currency of Transactions.** All Transactions shall be conducted in United States dollars, unless otherwise agreed to by the Bank.

    e. **Foreign Currency Transactions.** Customer agrees, unless Customer notifies the Bank otherwise in writing, that in effecting any foreign exchange transaction in connection with executing any purchase or sale or otherwise complying with Customer's instructions relating to any Transaction, the Bank (including any Agent) may act as counterparty, principal, underwriter, agent or broker or in any other capacity, and may be compensated separately in each such capacity.

7. **Communications**

    a. **Communications to the Bank**

        i. Except for instructions accepted by the Bank, notices and communications by Customer to the Bank shall be effective only upon receipt in writing by the Private Banking Department at the Office at the address specified below (the "Address"), or at such other address as the Bank may designate from time to time by notice to Customer.

        ii. If Customer is more than one person or entity, each Customer understands and agrees that the Bank may follow the instructions of either or any of them, which instructions shall be binding upon all Customers, without obtaining the consent of the other or others (including but not limited to instructions relating to the disposition, transfer or withdrawal of any of the Investment Account's Holdings), and that the Bank has no duty to inquire as to the purpose or propriety of any such instructions. Each Customer hereby expressly releases the Bank and agrees jointly and severally to indemnify, reimburse and hold the Bank harmless from, and agrees that the Bank shall not have any loss on account of or liability for, any and all Claims arising by reason of following any such instructions.

        iii. Customer agrees to comply with any procedures the Bank may establish regarding the giving of instructions, including procedures for all Bank customers. In any event, instructions shall be deemed given to the Bank only when received at, and accepted by, the Private Banking Department at the Office and only if otherwise satisfying the Bank's requirements. All instructions shall be irrevocable once given unless the Bank shall agree otherwise in each specific instance.

        iv. Customer may place orders and solicit price quotations only during the Bank's normal business hours on any day on which both the Office and the New York Stock Exchange are open for the transaction of normal business (a "Business Day"). The Bank shall treat all instructions as market orders, that is, as orders to be executed under current market conditions, unless Customer specifically directs otherwise. Customer acknowledges and understands that the Bank will not be liable for any damages or lost profits in the event that the Bank is unable or declines to execute any of Customer's orders. Instructions shall be subject to all applicable laws, regulations, rules, policies, procedures and requirements of any and all governmental authorities, self-regulatory organizations, exchanges, markets, issuers and Agents. Ordinarily, when the Bank receives Customer's instructions on a Business Day before 3:00 p.m., local time at the Office, the Bank will act on them within one Business Day after receiving them but shall not be liable for any reasonable delay in effecting any instructions.

        v. In receiving and acting upon any telephonic, telex, fax or other telecommunications instructions on Customer's behalf, the use of Customer's name or names -- and, in the case of fax instructions, any apparent signature of Customer -- whether or not genuine, may be deemed by the Bank without liability, to constitute full authorization by Customer to the Bank with respect to any such instructions without further inquiry or verification, regardless of whether (A) such instruction was genuine or not, (B) the person(s) giving such instruction was or was not the Customer or Customer's authorized representative, or (C) Customer actually authorized the instructions. The Bank shall not be required, and shall not be responsible for any failure, otherwise to establish the authorization or lack of authorization of any person or instructions. Furthermore, the Bank may, without liability, in its absolute discretion, act or refuse to act in whole or in part upon any instruction which fails to satisfy it completely or to meet security measures, if any, adopted by it. However, the Bank is not required to adopt any security measures.

        vi. Since the time available for the Bank to consider telecommunications requests is relatively short, it is hereby agreed that if, after receiving and considering a request, the Bank

determines in its sole judgment that (A) it cannot for any reason comply with or fulfill such a request, in whole or in part, the Bank may, in its sole discretion, comply with or fulfill same in part only or not at all, and (B) if the request is unclear or additional details or information are required in order for the Bank to comply with or fulfill such request, in whole or in part, it may, in its sole discretion, comply with or fulfill same in part only or not at all, delay in complying with or fulfilling same in whole or in part until additional details or information are received or take such other action in accordance with the Bank's understanding of such request. Notwithstanding any oral acceptance by the Bank or any of its Agents of any telecommunications requests, it may, for any reason (including without limitation commercial or policy considerations or changes therein or in any other circumstances), reject such request, in whole or in part, whereupon the Bank shall be entitled, in its sole discretion, to comply with or fulfill such request in part only or not at all. Customer's failure to perform any obligation to the Bank under the Agreement shall not be excused by the Bank's not complying with instructions or complying with instructions only in part.

vii. Customer acknowledges and agrees that the Bank may, but shall not be required to, from time to time tape record conversations between its representatives and Customer or Customer's representatives. Any tape recordings of such conversations and any transcripts of recordings shall be deemed part of the Bank's business records, admissible in evidence in any legal proceedings relating to the Agreement. The Bank shall not be required or expected to retain any such recordings or transcripts except in its sole discretion.

viii. At all times, the Bank shall have the right, in its discretion, to refuse to accept any instructions that the Bank deems to be unsuitable or unacceptable for any reason whatsoever.

b. **Communications to Customer**

i. All notices and communications to Customer shall be effective, deemed received and constitute personal delivery to Customer (i) when sent, whether by mail or by telex, fax, email or other telecommunications media, to Customer's address for communications applicable to the Bank Account, as it may be modified from time to time, or (ii), if sent by messenger, when left at such address, or (iii) if the Bank Account is subject to hold-mail instructions, when placed in Customer's "hold-mail" file at the Office.

ii. The Bank shall endeavor to furnish Customer with quarterly statements. Any Customer's failure to object in writing to the Bank within sixty (60) days after any statement's delivery or deemed delivery shall constitute assent to such statement and shall be final and binding, as to all matters stated in that statement or as shown by it, upon Customer and Customer's successors, assigns, personal representatives, estates, Guardians, Executors, and all other persons, whether or not in being, who may thereafter become eligible to share in Customer's estate.

iii. Customer agrees to bear all risks resulting from any hold-mail instructions, including without limitation, risks resulting from nonreceipt or delay in receipt by Customer of any notices, communications or statements. Each Customer hereby expressly releases the Bank and agrees jointly and severally to indemnify, reimburse and hold the Bank harmless from, and agrees that the Bank shall not have any loss on account of or liability for, any and all Claims arising by reason of following any hold-mail instructions. Customer understands that there may be an additional fee for hold-mail service and agrees to pay such fee.

8. **Transfer, Termination, Withdrawal, Addition**

a. **Pledge or Grant of Security Interest.** Customer, may, at any time, make a pledge or a grant of a security interest in the Investment Account and its Holdings (a "Pledge") to the Bank or any Affiliate (the "Lender") as collateral for a loan or other credit facility or financial accommodation (a "Credit Facility") granted by the Lender to Customer or to another party or parties. In any such event, Customer agrees, at the request of the Lender or the Bank, to execute and deliver to the Lender or the Bank all documents requested by the Lender or the Bank to accomplish the Pledge. Notwithstanding anything to the contrary in the Agreement, Customer agrees that, until all obligations of Customer are fully discharged, (i) such Pledge shall operate to place the Lender's or the Bank's claims against the Investment Account in a position prior to those of each Customer and of any Executor or Guardian of each Customer, and (ii) the Bank and the Lender may provide each other with information with respect to the Investment Account's Holdings and the status of the Credit Facility. Customer (A) acknowledges that the provisions of this subparagraph may, without Customer's consent, violate the Bank's duty of loyalty to Customer, and (B) consents to, and waives any real or apparent conflict of interest that may result from, the provisions of this subparagraph, and (iii) waives any right to receive advice of any action authorized pursuant to this subparagraph. If there is more than one Customer, any or all of the Customers may agree to such pledge or hypothecation without the consent of any of the other Customers, but the Bank reserves the right in its discretion to require that all Customers agree to such pledge or grant of a security interest and execute documentation that is appropriate in the view of the Lender and the Bank.

b. **Customer's Death (Natural Persons).** Upon the death of Customer, or upon the death of the last surviving Customer if there is more than one, the Bank shall transfer ownership of the Investment Account upon the following terms and conditions:

i. The Investment Account shall be transferred to the personal representative, executor or administrator of the estate of the last surviving Customer (the "Executor"), as the case may be, provided that the Bank may require the Executor to present such documentation as the Bank may deem appropriate in its sole discretion, including but not limited to documentary proof that the Executor was duly and legally appointed and/or one or more legal opinions regarding the Executor's authority with respect to the Investment Account.

ii. The ownership of the Investment Account shall be transferred as provided herein within a reasonable period of time after (A) the Bank has received adequate legal notice of the death of the last surviving Customer and any additional documentation as the Bank may deem appropriate in its sole discretion, (B) all of the following conditions ("Conditions") have been satisfied: (1) any and all Charges are paid, (2) all of Customer's obligations to any Lender have been paid and satisfied in full, and (3) the Bank is assured, in its sole judgment, that there exists (a) no prior or conflicting claim, including without limitation any claim to or against the Investment Account or against Customer or Customer's estate, and (b) no legal impediment to, and no risk to the Bank from effecting, such transfer. The Bank may, in its sole discretion, effect such transfer subject to any such claim if it is assured, in its sole judgement, that such transfer would not subject the Bank to any risk.

iii. Customer understands that there could be estate tax liability in the United States if the Investment Account has Holdings subject to such taxes on the date of death of a Customer.

iv. If Customer has pledged or granted a security interest in the Investment Account's Holdings to a Lender in accordance with the provisions of the Agreement, then, notwithstanding anything herein to the contrary, any transfer of the Holdings of the Investment Account to any Executor or Guardian of any Customer shall be superseded until payment is made in full to the Lender. If so requested by the Lender upon the death of any Customer, the Holdings of the Investment Account shall be withdrawn to pay the obligations of Customer to the Lender in full, and the remainder, if any, of the Investment Account's Holdings shall remain in the Investment Account or, if applicable, transferred under the provisions hereof.

v. Each Customer hereby expressly releases the Bank and agrees jointly and severally to indemnify, reimburse and hold the Bank harmless from, and agrees that the Bank shall not have any loss on account of or liability for, any and all Claims arising by reason of the Bank's transfer of the Investment Account as provided herein and/or from any claim to or against the Investment Account or Customer's estate or against Customer.

vi. The Bank makes no representation to Customer that the Investment Account is not subject to the laws of other jurisdictions in addition to that of the state in which the Office is located (the "State").

c. **Appointment of Guardian (Natural Persons).** In the event that a personal representative, committee, conservator, guardian or the like ("Guardian") for a Customer shall be appointed by any court of competent jurisdiction during a Customer's lifetime, then while the appointment of such Guardian shall be in effect, the Guardian may not make a withdrawal from the Investment Account unless (i) said court and all other Customers, if any, consent thereto or (ii) a court of competent personal jurisdiction acting pursuant to legal authority orders the Bank to do so. The Bank may require the Guardian to present such documentation as the Bank may deem appropriate in its sole discretion, including but not limited to documentary proof that the Guardian was duly and legally appointed and/or one or more legal opinions regarding the Guardian's authority with respect to the Investment Account.

d. **Early Termination by the Bank.** At any time, the Bank may terminate this Agreement and the Investment Account and effect the immediate transfer (subject to the other provisions of the Agreement) of any or all of the Investment Account's Holdings to Customer or to any Executor or Guardian thereof, for any reason, in the Bank's sole discretion, including but not limited to the Bank's determination in its sole judgment that (i) continued administration is no longer practicable because of the Investment Account's size or otherwise from the Bank's point of view, or (ii) it is prevented by law or regulation from continuing to offer this type of service, or (iii) it becomes unprofitable or otherwise not in the Bank's interest for the Bank to continue to do so, or (iv) the Bank or any Lender deems itself insecure with respect to any obligation of Customer to the Bank or such Lender.

e. **Withdrawal or Addition by Customer.** Subject to any additional requirements specified in the Agreement, any or all of the Customers (without the consent of any of the other Customers, even if there shall be more than one living Customer) may withdraw all or any part of, or (subject to the Bank's consent) add to, the Holdings of the Investment Account. Unless mutually agreed otherwise by the Bank in its discretion and the Customer or Customers requesting same, the Bank shall effect any such withdrawal by transfer to said Customer or Customers, subject to any obligations of Customer and claims against the Investment Account, and after all of the Conditions have been satisfied. The Bank may, in its sole discretion, effect such transfer subject to any such claim if it is assured, in its sole judgement, that such transfer would not subject the Bank to any risk.

9. **Customer's Representations and Warranties**

The Bank may rely on the information set forth below until written notice of any change is received by the Bank. Each Customer agrees to notify the Bank within 30 days of any change. Each Customer represents and warrants to the Bank that:

a. Customer is not and reasonably expects not to be engaged in a trade or business in the U.S. during any calendar year; and if a natural person, Customer is not a citizen or resident of the U.S. and has not been and reasonably expects not to be present in the U.S. for a total of 183 or more days during any calendar year (or, in either case, gains from Customer's transactions are exempt from U.S. Federal income taxation under a U.S. tax treaty). If a corporation or other entity, Customer is not incorporated or organized under the laws of the U.S. or of any state or possession thereof.

b. Customer has full right, power and authority, and if a natural person Customer is of legal age and possesses the necessary legal capacity to execute, deliver and perform the Agreement. The Agreement constitutes each Customer's valid and binding contract, enforceable against Customer in accordance with their terms.

CONFIDENTIAL

BLUSA-HAPOALIM 00000504

c. The execution, delivery or performance by Customer of the Agreement is not, and will not be, in violation of any provision of any charter, by-law, other agreement, law, regulation, order or court process or decision to which Customer is a party or by which Customer or Customer's properties are bound or affected.

d. There are no outstanding liens against, or security interests in, the Investment Account or Holdings of the Investment Account. Customer agrees that Customer will neither create, nor suffer the creation of, any lien or security interest against the Investment Account or its Holdings, with the exception of liens or security interests in favor of the Bank or any Affiliate.

## 10. Miscellaneous

**a. Entire Agreement; No Oral Changes: Amendment by the Bank.** The Agreement represents the entire agreement of the parties with respect to the matters contained therein and may not be amended, changed or terminated except in writing. Notwithstanding the foregoing, Customer unconditionally and irrevocably authorizes the Bank to effect any amendment, change or termination of the Agreement without Customer's consent except to the extent prohibited by applicable law or regulation, effective the later of (a) 30 calendar days after the Bank has given Customer notice thereof as provided herein or (b) after any length of time required by applicable law or regulation.

**b. English Version Controlling.** A Spanish translation of the Agreement may be provided for the convenience of Customer. Nevertheless, Customer understands and agrees that the English language version thereof shall control in the event of any differences in meaning.

**c. Governing Law and Powers of the Bank; Disputes and Litigation.** Except to the extent otherwise provided herein, the Investment Account and the Agreement shall be governed by the internal laws of the State (as such term is defined in paragraph 8.b.vi of the Agreement), without giving effect to conflicts of laws principles. The Bank shall have all the powers provided under those laws. Customer submits to the nonexclusive jurisdiction of the federal and state courts in the State in the county in which the Office is located, with respect to any disputes relating to the Investment Account and/or the Agreement. Customer agrees to be bound by any decision rendered in any judicial or arbitration proceeding(s) between the Bank and any Agent. Customer will not bring any legal or other action against the Bank in any other jurisdiction or forum without the Bank's prior written consent, which may be withheld in the Bank's sole discretion. Service of process may be made on Customer by personal delivery at, or by mail addressed to Customer at the address for notices and communications specified in the Agreement.

**d. Limitations on Customer's Use of Data Provided by Standard & Poor's.** The Bank provides certain information to the Customer using the services of SunGard Asset Management Systems, Inc. ("SunGard"), which in turn provides the Bank with access to certain data (the "Data") provided by Standard & Poor's Global Settlement Services, a Division of The McGraw Hill Companies ("GSS"). The Customer agrees not to reproduce, display or distribute or have distributed in a manner that competes with GSS or SunGard or to use the Data in connection with any business of providing municipal or taxable security pricing, evaluation services, dividend or UIT announcements, or a municipal or taxable security descriptive information look-up service. The Customer also agrees not to populate the Customer's accounting systems with electronic reports derived from the Data for accounting purposes.

CONFIDENTIAL

BLUSA-HAPOALIM 00000505

d. **JURY TRIAL WAIVER.** CUSTOMER AND THE BANK WAIVE THE RIGHT TO A JURY TRIAL WITH RESPECT TO ANY DISPUTE RELATING IN ANY WAY TO THE TRUST AND/OR THE AGREEMENT; ANY JUDICIAL PROCEEDING WITH RESPECT TO ANY SUCH DISPUTE SHALL TAKE PLACE WITHOUT A JURY.

11. **INVESTMENT RISKS.** CUSTOMER AGREES, UNDERSTANDS AND ACKNOWLEDGES THAT:

   a. THE INVESTMENT ACCOUNT AND ALL HOLDINGS (i) ARE *NOT* INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION (FDIC); (ii) ARE *NOT* DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, THE BANK (EXCEPT TO THE EXTENT THAT A SPECIFIC HOLDING REPRESENTS THE EXPLICIT OBLIGATION OR GUARANTY OF THE BANK); AND (iii) ARE SUBJECT TO INVESTMENT RISKS INCLUDING POSSIBLE LOSS OF PRINCIPAL AND/OR DEPRECIATION IN VALUE. CUSTOMER ALSO UNDERSTANDS THAT ANY HOLDING MAY *NOT* BE READILY MARKETABLE.

   b. THE BANK IS *NOT* ACTING AS A FIDUCIARY OR ADVISOR TO CUSTOMER IN CONNECTION WITH ANY TRANSACTION, THE INVESTMENT ACCOUNT, ANY HOLDINGS AND/OR THE AGREEMENT. THE BANK HAS *NO* RESPONSIBILITY WHATSOEVER FOR THE PERFORMANCE OF ANY TRANSACTION, ANY HOLDINGS AND/OR THE INVESTMENT ACCOUNT.

   c. CUSTOMER WILL MAKE CUSTOMER'S OWN INVESTMENT DECISIONS AND WILL *NOT* RELY ON ANY STATEMENT, REPRESENTATION, WARRANTY, INFORMATION, RECOMMENDATION, SUGGESTION, OPINION OR ACTION, OR THE ABSENCE THEREOF, BY THE BANK OR ITS REPRESENTATIVES. THE BANK MAY TAKE POSITIONS FOR ITS OWN PORTFOLIO THAT DIFFER FROM ANY THAT IT MAY RECOMMEND TO, OR THAT MAY BE TAKEN BY, CUSTOMER.

12. **Disclosure of Beneficial Owner.** SEC Rule 14b-2 requires the Bank to provide each beneficial owner's name, address and securities position to any requesting issuer whose voting securities are owned by such beneficial owner, unless the beneficial owner objects.

*Check the box below to prevent such disclosure.*
☒ The Bank is *NOT* authorized to release Customer's name, address and securities positions.

13. **Title of Investment Account:**
DAVID EHRLICH / ENRIQUE EHRLICH / ANGELA S. TYKOCKI / SARA R. GOLDSTEIN.

14. **Office and Address [CHECK ONE BOX]:**
☒ Bank Hapoalim B.M. New York Branch or Plaza Branch, 1177 Avenue of the Americas, New York, NY 10036

☐ Bank Hapoalim B.M. Miami Agency, 201 South Biscayne Boulevard, Miami, FL 33131

15. **Bank Account:** the following account number at the     Office: _____ Redacted 5010._____

Each of the undersigned agrees to be bound by the terms of this Agreement, and authorizes the Bank or its representative to complete any item in the Agreement, which completion shall be conclusive, final and binding in the absence of manifest error.

**AGREED TO:**

Date: _October 11_, 20 02.

Customer(s) (natural person(s)):

Customer 1: DAVID EHRLICH
(Print Name)
Signature: _____

Customer 2: ENRIQUE EHRLICH
(Print Name)
Signature: _____

Customer 3: ANGELA SYLVIA TYKOCKI
(Print Name)
Signature: _____

Customer (corporate or other entity):

_____ (Print Name)

By: (Signature) _____
Print Name: _____
Title: _____

By: (Signature) _____
SIGNED IN OUR PRESENCE
Known Personally

CONFIDENTIAL

BLUSA-HAPOALIM 00000506

d. **JURY TRIAL WAIVER.** CUSTOMER AND THE BANK WAIVE THE RIGHT TO A JURY TRIAL WITH RESPECT TO ANY DISPUTE RELATING IN ANY WAY TO THE TRUST AND/OR THE AGREEMENT; ANY JUDICIAL PROCEEDING WITH RESPECT TO ANY SUCH DISPUTE SHALL TAKE PLACE WITHOUT A JURY.

11. **INVESTMENT RISKS.** CUSTOMER AGREES, UNDERSTANDS AND ACKNOWLEDGES THAT:

a. THE INVESTMENT ACCOUNT AND ALL HOLDINGS (i) ARE *NOT* INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION (FDIC); (ii) ARE *NOT* DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, THE BANK (EXCEPT TO THE EXTENT THAT A SPECIFIC HOLDING REPRESENTS THE EXPLICIT OBLIGATION OR GUARANTY OF THE BANK); AND (iii) ARE SUBJECT TO INVESTMENT RISKS INCLUDING POSSIBLE LOSS OF PRINCIPAL AND/OR DEPRECIATION IN VALUE. CUSTOMER ALSO UNDERSTANDS THAT ANY HOLDING MAY *NOT* BE READILY MARKETABLE.

b. THE BANK IS *NOT* ACTING AS A FIDUCIARY OR ADVISOR TO CUSTOMER IN CONNECTION WITH ANY TRANSACTION, THE INVESTMENT ACCOUNT, ANY HOLDINGS AND/OR THE AGREEMENT. THE BANK HAS *NO* RESPONSIBILITY WHATSOEVER FOR THE PERFORMANCE OF ANY TRANSACTION, ANY HOLDINGS AND/OR THE INVESTMENT ACCOUNT.

c. CUSTOMER WILL MAKE CUSTOMER'S OWN INVESTMENT DECISIONS AND WILL *NOT* RELY ON ANY STATEMENT, REPRESENTATION, WARRANTY, INFORMATION, RECOMMENDATION, SUGGESTION, OPINION OR ACTION, OR THE ABSENCE THEREOF, BY THE BANK OR ITS REPRESENTATIVES. THE BANK MAY TAKE POSITIONS FOR ITS OWN PORTFOLIO THAT DIFFER FROM ANY THAT IT MAY RECOMMEND TO, OR THAT MAY BE TAKEN BY, CUSTOMER.

12. **Disclosure of Beneficial Owner.** SEC Rule 14b-2 requires the Bank to provide each beneficial owner's name, address and securities position to any requesting issuer whose voting securities are owned by such beneficial owner, unless the beneficial owner objects.

*Check the box below to prevent such disclosure.*
☒ The Bank is *NOT* authorized to release Customer's name, address and securities positions.

13. Title of Investment Account: _____

14. Office and Address [CHECK ONE BOX]:
☒ Bank Hapoalim B.M. New York Branch or Plaza Branch, 1177 Avenue of the Americas, New York, NY 10036

☐ Bank Hapoalim B.M. Miami Agency, 201 South Biscayne Boulevard, Miami, FL 33131

15. Bank Account: the following account number at the Office: _____Redacted_5010._____

Each of the undersigned agrees to be bound by the terms of this Agreement, and authorizes the Bank or its representative to complete any item in the Agreement, which completion shall be conclusive, final and binding in the absence of manifest error.

**AGREED TO:**

Date: _____, 20____

*Customer(s) (natural person(s)):*

Customer 1: SARA RAQUEL GOLDSTEIN
(Print Name)

Signature: [signature]

Customer 2: _____
(Print Name)

Signature: _____

Customer 3: _____
(Print Name)

Signature: _____

*Customer (corporate or other entity):*

_____
(Print Name)

By: (Signature) _____
Print Name: _____
Title: _____

By: (Signature) _____
Print Name: _____
Title: _____

[Stamps: "SIGNED IN OUR PRESENCE / Known to us"; "SIGNATURE VERIFIED BPNY"; "BANK HAPOALIM TELLER'S 74C ID #8521 2002 OCT 21 PM 3:50"]