**EXHIBIT W**

# In The Matter Of:

*BANK LEUMI USA*
*v.*
*DAVID EHRLICH*

_____

*WILLIAM SERRANO - Vol. 1*
*June 19, 2014*

_____

**MERRILL CORPORATION**
LegaLink, Inc.
225 Varick Street
10th Floor
New York, NY 10017
Phone: 212.557.7400
Fax: 212.692.9171

```
UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - -x

BANK LEUMI USA,

                          Plaintiff,

            -against-

DAVID EHRLICH, ANGELA TYKOCKI, ENRIQUE EHRLICH,
and SARA GOLDSTEIN

                          Defendants.

- - - - - - - - - - - - - - - - - - - - - - -x


                          160 Broadway
                          New York, New York

                          June 19, 2014
                          2:55 p.m.



     DEPOSITION of BANK LEUMI USA, a Plaintiff in the
above-entitled action, by WILLIAM SERRANO, held at the
above time and place, pursuant to Notice, taken before
Stephanie Hicks, a shorthand reporter and Notary Public
within and for the State of New York.


                                        LEX #104648
```

WILLIAM SERRANO - 6/19/2014

Page 2

```
 1     A p p e a r a n c e s:

 2

 3

 4        MAYER BROWN, LLP
              Attorneys for Plaintiff
 5            1675 Broadway
              New York, New York 10019
 6        BY: JAMES ANCONE, ESQ.

 7

 8

 9        ALCANTAR LAW, PLLC
              Attorneys for Defendants
10            22 Cortlandt Street, 16th Floor
              New York, New York 10007
11        BY: JOSE RAUL ALCANTAR, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    sometime in 2008, 2009, as a result of the crisis.  Do
 2    you recall more of a specific time period; month,
 3    quarter?
 4        A.  I don't.
 5            MR. ALCANTAR:  A few regulatory
 6        questions in-depth.
 7        Q.  Have you ever been investigated or interviewed by
 8    any financial regulatory authority here in the United
 9    States?
10        A.  Never.
11        Q.  So you've never had contact that was
12    investigatory and you've never been interviewed by FINRA
13    or the SEC?
14        A.  No, correct.
15        Q.  I want to ask a follow-up question about the
16    international aspect of your job, if you can try to just
17    provide more detail.  How do you perform transactions
18    for foreign private banking clients, if you could take
19    me just as an example, what steps would be involved in
20    that?
21        A.  Currently?
22        Q.  If you recall in 2008, that's the relevant --
23        A.  Okay, in 2008, BLUSA had affiliate offices
24    throughout Latin America.  At the time, bankers within
25    those countries would contact the dealing room or
```

 1    trading room directly to execute or place orders
 2    directly with us, the traders, including buy and sell
 3    orders on bonds, on stocks, on an array of securities,
 4    either, you know, trades would come in through Bloomberg
 5    or through telephone or the wire.  That has changed up
 6    with regulation changing, but that was the fundamental
 7    bulk of the business at the time, international.
 8       Q.  Now, when you say that changed, did that change
 9    after 2008?
10       A.  I believe so, like I said, right after the
11    crisis.
12       Q.  When you say, bankers directly, I just want to
13    follow up on that a little bit.  Do you mean bankers
14    located in the affiliate offices?
15       A.  Yes, the representatives assigned to the accounts
16    locally in the countries where we had a branch or a
17    presence.
18       Q.  And where is this trading room you reference,
19    where is it located?
20       A.  It's located at 564 Fifth Avenue.
21            MR. ALCANTAR:  Now, I'm going to
22              introduce as an exhibit an e-mail produced
23              by Leumi Latin America in the Uruguayan
24              proceedings to be marked as
25              Defendant's Exhibit A.

```
 1    direction of buy or sell, quantity, and applicable
 2    account numbers on the security to be purchased.
 3       Q.  Now, if you could read the second line on the
 4    first page where it begins with "Kaupthing", if you
 5    could read across that for the record, please?
 6       A.  Sure, "Kaupthing Bank, KAUP 5 3/4 10/11."
 7       Q.  That's sufficient.
 8           And what is that that you just read?
 9       A.  This is a brief description on the issuer, the
10    coupon on the selected, stated bond, and an abbreviated
11    version of its maturity date.
12       Q.  Now, if you could turn to the next page, please?
13       A.  (Witness complies.)
14       Q.  I understand that this relates to the order flow,
15    but what is it we're looking at exactly on this page?
16       A.  This is our evidence that we did a trade with a
17    broker in the street, it shows the security, the
18    Kaupthing 5.75s, October 2011, and it shows our interest
19    to buy the security or sell the security, in this case,
20    it is to purchase the security, this is our evidence to
21    show that we did a trade.
22       Q.  Where is that interest that you manifest, where
23    is that represented here?
24       A.  Where I'm asking for an offer of 200,000, price
25    is given to me at 88.2, and I said, "thanks for that",
```

```
 1     and I would assume this would have been a fill.
 2        Q.   What do you mean by "fill"?
 3        A.   Fill means there was -- a transaction was
 4     successfully completed.
 5        Q.   So you authored the text --
 6        A.   Correct.
 7        Q.   -- on this sheet?
 8        A.   Yeah, this would be my -- the first line in the
 9     body of the e-mail says "where is your offer", that
10     would be me writing that to this Tanya person.
11        Q.   And right after that, the page states "Reply",
12     who would be replying that?
13        A.   This would be the salesperson, or Tanya,
14     replying, giving me a price on the selected --
15        Q.   Who did you receive direction from, in terms of
16     the terms of the proposed transaction?
17        A.   Can you rephrase, please?
18        Q.   Yes.
19             Was this transaction executed under your
20     discretion?
21        A.   No.
22        Q.   So who would you receive information from?
23        A.   Well, I would receive an order from a banker to
24     purchase or sell a security.
25        Q.   Do you recall who gave you the order in this
```

```
 1    instance?
 2        A.   Yes, I do.
 3        Q.   Who was that?
 4        A.   This would have been -- the order came directly
 5    from Fernando Vidal in Leumi Latin America --
 6        Q.   And how --
 7        A.   -- and a sign-off of Uriel.
 8        Q.   How do you recall that?
 9        A.   There is an e-mail here and I recall the trade
10    (indicating).
11        Q.   By "e-mail", I see you pointing to a trade
12    ticket.  Is that what you're --
13        A.   Oh, yes, yes, the actual order instruction to
14    purchase the security is currently in my hand and I'm
15    seeing it.
16        Q.   So just to make it clear for the record, this
17    message that you're pointing to on Page 3 of the
18    exhibit, this particular screen was generated by
19    Fernando Vidal; is that --
20        A.   Correct.
21        Q.   That is correct?  Thank you.
22             You also said with the authorization of Uriel.
23    In this instance, how do you know that's the case?
24        A.   Right in the second line within the body of the
25    e-mail, there's a sign-off that says, "Uriel", that's
```

```
 1        Q.   Who is this exchange between?
 2        A.   This would be an exchange between Fernando Vidal
 3   login information and myself.
 4        Q.   Now, I want to direct your attention to the part
 5   of the screen beginning with "Reply", the first reply,
 6   if you could read that first line for the record,
 7   please?
 8        A.   "Can offer at 88 1/2, 5 minutes firm."
 9        Q.   Do you know who typed that?
10        A.   I typed that.
11        Q.   And the following reply, please, if you could
12   read it?
13        A.   "Need 5 min more.  Uriel".
14        Q.   So where did that message come from again?
15        A.   This message came from Fernando Vidal's Bloomberg
16   login, but Uriel using his Bloomberg terminal as his
17   means of communicating with the trading desk.
18        Q.   Now, the following reply, if you could just read
19   that first line?
20        A.   I'll try.
21        Q.   I think there's a line just above that, but it
22   seems to be indented?
23        A.   Yes.
24        Q.   What does that state?
25        A.   "Change amount."
```

```
 1      Q.   That message, do you know who that came from?
 2      A.   From Fernando Vidal, Uriel -- slash Uriel.
 3           MR. ALCANTAR:  If we could break, if
 4      that's okay, and I may have some follow-up
 5      questions?
 6           MR. ANCONE:  Sure.
 7           (Whereupon, a brief recess was taken.)
 8           MR. ALCANTAR:  I just wanted to ask a
 9      couple of follow-up questions about where we
10      left off.
11      Q.   Do you know if Leumi Latin America had the
12  capacity to effectuate transactions on Bloomberg?
13      A.   No.
14      Q.   You do not know?
15      A.   No, I do know, I do know, and they could only
16  transact with us, with BLUSA, and they would have the
17  authority to contact us directly to place orders for, in
18  this case, fixed income securities.
19      Q.   Now, in your opinion, understanding that you're a
20  trader, is signing off on the terms of a transaction an
21  important aspect of that transaction?
22      A.   Absolutely.
23      Q.   And how so?
24      A.   With the sign-off, meaning we need to receive the
25  actual instruction, we have to see it legibly where it
```

```
 1      A.   I've met her.
 2      Q.   How do you know her?
 3      A.   She was, not anymore, but was a banker in Leumi
 4   Latin America that worked the same duties like Uriel,
 5   she was an accounts officer in Leumi Latin America.
 6      Q.   So she was not a BLUSA employee?
 7      A.   Don't -- no, Leumi Latin America.
 8              MR. ALCANTAR:  Okay, thank you.
 9           That's all I have.
10              MR. ANCONE:  I have some follow-up
11           questions.
12           I just need a minute.
13        FURTHER EXAMINATION
14        BY MR. ANCONE:
15              MR. ANCONE:  I want to introduce an
16           exhibit, Plaintiff's Exhibit 1, please.
17              (Six-page document was marked as
18           Plaintiff's Exhibit 1 for identification, as
19           of this date.)
20      Q.   Mr. Serrano, could I direct your attention to the
21   last page that's been stamped BLUSA-EHRLICH 277 in the
22   lower right-hand corner?
23      A.   Yes, okay.
24      Q.   Do you recognize this series of documents?
25      A.   Yes, I do.
```

```
 1        Q.   What is it?
 2        A.   This is the communication that would give
 3   instructions on purchasing this particular security.
 4        Q.   Could I direct your attention to the upper
 5   left-hand corner next to the date.  What is the
 6   timestamp on this?
 7        A.   8:13 and nine seconds.
 8        Q.   Do you have an understanding of which local time
 9   that is?
10        A.   Yes.
11        Q.   And what would that be?
12        A.   This would be New York, this would be New York or
13   Eastern Standard Time.
14        Q.   You testified earlier that you were on this
15   Bloomberg chat, correct?
16        A.   Correct.
17        Q.   At that time in February 2008, who was your
18   employer?
19        A.   BLUSA.
20        Q.   That office is where?
21        A.   564 Fifth Avenue, New York.
22        Q.   Staying on this page, can you just tell me what
23   is being asked of you in this exchange?
24        A.   Certainly.  I'm being asked by, in this case,
25   Uriel using Fernando Vidal's Bloomberg terminal in Leumi
```

```
 1    Latin America, for an offer price or a price to buy a
 2    Kaupthing Bank 5.75 2011 maturity bond in the amount of
 3    $200,000.
 4        Q.   Could you flip to the next page that has been
 5    stamped BLUSA-EHRLICH 276 in the lower right-hand
 6    corner?
 7        A.   Yes.
 8        Q.   Could you read the timestamp on that?
 9        A.   8:18 and fifty seconds.
10        Q.   You testified earlier, I believe, that you were
11    also on this exchange?
12        A.   Correct.
13        Q.   What does this exchange represent?
14        A.   This is my communication with Credit Suisse as a
15    broker where I would be -- negotiated and purchased a
16    specified amount of 550,000 bonds of this particular
17    Kaupthing Bank.
18        Q.   What would you actually be negotiating?
19        A.   Well, in this particular case, I'm negotiating
20    the -- I'm asking for a price on the relevant -- on this
21    particular security and I would ask exactly what the
22    price would be, that's it.
23        Q.   What capacity is Credit Suisse playing here?
24        A.   They are being my -- they are my broker.
25        Q.   Is Credit Suisse providing you a price?
```

```
 1       Q.   Could you turn to the first page in this document
 2   stamped BLUSA-EHRLICH 272?
 3       A.   Yes.
 4       Q.   Could you read the timestamp in the upper
 5   right-hand corner, please?
 6       A.   8:26.
 7       Q.   And the date?
 8       A.   February 21, 2008.
 9       Q.   Could you just briefly describe what this
10   document represents?
11       A.   This is a Bloomberg-generated trade ticket
12   showing a purchase of the Kaupthing Bank from BLUSA by
13   Credit Suisse.
14       Q.   So BLUSA bought the Kaupthing Bank bonds from
15   Credit Suisse as we saw before?
16       A.   Correct.
17       Q.   Where did that occur?
18       A.   This occurred on -- when?
19            MR. ANCONE:  Withdrawn.
20       Q.   Does this represent an execution of the order?
21       A.   Yes.
22       Q.   And where did that execution occur?
23       A.   It occurred in New York via Bloomberg.
24       Q.   Do you see the line that says "principal"?
25       A.   Yes.
```

```
1     A.   Yes.
2              MR. ANCONE:  I have no further
3          questions.
4              MR. ALCANTAR:  That concludes the
5          deposition.
6              (Whereupon, the examination of William
7          Serrano was concluded at 4:07 p.m.)
8
9
10    _____
11              WILLIAM SERRANO
12
13    Subscribed and sworn to before me
14    This  6  day of  June  , 20 14 .
15    _____
16    NOTARY PUBLIC
17
18
19
20
21
22
23
24
25
```

WILLIAM SERRANO - 6/19/2014

Page 44

```
 1
 2
 3                    I N D E X
 4
 5   WITNESS            EXAMINATION BY          PAGE
 6   William Serrano    Mr. Alcantar             4
 7                      Mr. Ancone              30
 8
 9                    EXHIBITS
10   DEFENDANT'S                                PAGE
11       A    Two-page document                  14
12       B    Six-page trading ticket            19
13   PLAINTIFF'S                                PAGE
14       1    Six-page document                  30
15       2    Six-page document                  38
16
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E

I, STEPHANIE HICKS, a reporter and Notary Public

within and for the State of New York, do hereby certify:

That the witness(es) whose testimony is hereinbefore

set forth was duly sworn by me, and the foregoing

transcript is a true record of the testimony given by

such witness(es).

I further certify that I am not related to any of the

parties to this action by blood or marriage, and that I

am in no way interested in the outcome of this matter.