Mark G. Hanchet, Esq.
James Ancone, Esq.
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
Telephone:  (212) 506-2500
Facsimile:  (212) 262-1910

*Counsel for Plaintiff Bank Leumi USA*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BANK LEUMI USA,<br><br>                              Plaintiff,<br><br>                – against –<br><br>DAVID EHRLICH, ANGELA TYKOCKI,<br>ENRIQUE EHRLICH, and<br>SARA GOLDSTEIN,<br><br>                              Defendants. | Case No. 12-CV-4423 (AJN)<br><br>**ORAL ARGUMENT<br>REQUESTED** |

**BANK LEUMI USA'S COUNTER-STATEMENT OF UNDISPUTED FACTS
PURSUANT TO RULE 56.1 AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Rule 56.1 of the Local Civil Rules of Southern District of New York, and in opposition to the summary judgment filed by Defendants David Ehrlich, Angela Tykocki, Enrique Ehrlich, and Sara Goldstein (collectively, "Defendants"), Plaintiff Bank Leumi USA ("BLUSA") submits the following counter-statement of undisputed facts and statement of additional material facts as to which there can be no genuine issue for trial:

## COUNTER-STATEMENT

1.      Defendants are all citizens of Uruguay. [Declaration of David Ehrlich, Angela Tykocki, Enrique Ehrlich, and Sara Goldstein In Support of Defendants Motion to Dismiss the Complaint, Dkt. No. 10 ("Defendants' First Decl.") ¶ 2].

Response:  **Undisputed**.

2.      Defendants have their sole place of residence in Uruguay. [Defendants' First Decl. ¶ 2].

Response:  **Undisputed**.

3.      Defendants have lived essentially their entire lives in Uruguay as natives. [Defendants' First Decl. ¶ 3]

Response:  **Undisputed**.

4.      Defendants have never had any office, residence, telephone, or telephone listing in New York State. [Defendants' First Decl. ¶ 5].

Response:  **Undisputed**.

5.      Defendants are not registered or licensed to transact business in New York State, and Defendants do not lease or own any type of real property in New York State. [Defendants' First Decl. ¶¶ 6, 7].

Response:  **Undisputed**.

6.      Defendants have never commenced legal action in New York State nor have they designated anyone to accept service of process for them in New York State. [Defendants' First Decl. ¶¶ 8, 9].

Response:  **Undisputed**.

7.      Defendants do not supply goods or services or conduct any business activities or meetings of any type in New York or even the United States. [Defendants' First Decl. ¶ 10].

Response:  **Disputed, in part**.  The record demonstrates that Defendants have conducted business activities in New York.  Specifically, in September 2002, Defendants applied to open three non-discretionary brokerage accounts with BLUSA.  Those three accounts were opened in New York.  (Ancone Decl., Ex. T at ¶¶ 11-13.)  Over the course of about three of those years,

Defendants purchased and sold at least $11 million worth of securities through those BLUSA accounts. (Ancone Decl., Exs. H, I, J, K.) Per BLUSA's standard practices relating to non-U.S. resident customers, each of those buy or sell orders was transferred to BLUSA's trading desk in New York and executed in New York. (Ancone Decl., Ex. W at 12:15-13:20, 27:11-18.) Defendants also opened an investment account with Bank Hapoalim, B.M., through its New York branch ("Bank Hapoalim") in October 2002. (Ancone Decl., Ex. L.)

8.      Except for opening accounts via Uruguayan branches or representatives, Defendants have never entered into contracts with companies based in New York or even the United States. [Defendants' First Decl. ¶ 12].

Response: **Undisputed,** except to clarify that the record demonstrates that Defendants have conducted business activities through the opening and maintenance of investment accounts at BLUSA and Bank Hapoalim. (Ancone Decl., Exs. A, B, C, H, I, J, K, L.)

9.      Defendants' family has been clients of Leumi Latin America since sometime in the 1980's. [Defendants' First Decl. ¶ 11].

Response: **Undisputed**.

10.     Defendants have never visited BLUSA's offices in New York, New York. [Defendants' First Dec. ¶ 16; see also Declaration of David Ehrlich and Enrique Ehrlich In Support of Joint Answer and Counterclaims Submitted on This Date By Our Counsel Jose Raul Alcantar Villagran, dated March 4, 2014, Dkt. No. 60-1 ("Defendants' Second Decl.") ¶ 3].

Response: **Undisputed**.

11.     Defendants executed all agreements with Plaintiff in Montevideo, Uruguay. [Defendants' First Decl. ¶ 14].

Response: **Undisputed**, except to clarify that the record demonstrates that the only "agreements" entered into between BLUSA and Defendants consisted of the Account Applications and the incorporated set of provisions found in the International Account Terms. (Ancone Decl., Exs. A, B, C, D.)

12.     The BLUSA international account applications executed by Defendants were

discussed with Leumi Latin America personnel in Montevideo, Uruguay, in Spanish. [Defendants' First Decl. ¶ 14].

       Response: **Undisputed**.

       13.    The BLUSA international account applications executed by Defendants were written in English. [See generally International Account Applications, attached as Exhibit A to Defendants' First Decl. ("International Account Applications"); see also Defendants' First Decl. at ¶ 14].

       Response: **Undisputed**.

       14.    All fillable spaces in the international account applications were filled in English by Mr. Gregorio Malamud in his handwriting and all boxes were also filled by him pursuant to information provided by Defendants.  [Defendants' Second Dec. at ¶ 5].

       Response: **Disputed, in part**.  Each Defendant signed their respective Account

Applications on their own behalf.  (Ancone Decl. Ex. S at Nos. 1-6.)

       15.    The Deposition of Mr. David Ehrlich was conducted with the aid of a language interpreter who translated opposing counsel's questions directed to Mr. David Ehrlich from English to Spanish and Mr. David Ehrlich's answers from Spanish to English.  [David Ehrlich Dep., annexed to Memorandum of Law In Support of Defendants' Joint Motion for Summary Judgment as Exhibit B, at 5:2-12].

       Response: **Undisputed**.

       16.    The Deposition of Mr. Enrique Ehrlich was conducted with the aid of a language interpreter who translated opposing counsel's questions directed to Mr. Enrique Ehrlich from English to Spanish and Mr. Enrique Ehrlich's answers from Spanish to English.  [Enrique Ehrlich Dep., annexed to Memorandum of Law In Support of Defendants' Joint Motion for Summary Judgment as Exhibit C, at 5:2-12].

       Response: **Undisputed**.

       17.    Defendants opened their BLUSA accounts by completing account applications on September 17, 2002. [See International Account Applications; see also Complaint, Dkt. No. 1, at ¶¶ 19-22].

       Response: **Undisputed**, except to clarify that Defendants applied to open their BLUSA

accounts by completing the Account Applications and, pursuant to those Account Applications,

which were transmitted to New York, BLUSA opened Defendants' accounts in New York.

(Ancone Decl., Ex. T at ¶¶ 11-13, 23-24.)

18.     Defendants opened their BLUSA accounts by visiting the offices of Leumi Latin America in Montevideo, Uruguay. [Defendants' First Decl. at ¶ 11].

Response:  **Disputed**.  The paragraph of the declaration that Defendants cite does not support this assertion.  On September 17, 2002, Defendants completed and signed Account Applications to apply for their BLUSA accounts.  (Ancone Decl., Ex. S at Nos. 1-6.)  Those Account Applications were transmitted to BLUSA in New York.  (Ancone Decl., Ex. T at ¶¶ 11-12, 23.)  Pursuant to those Account Applications, BLUSA opened Defendants' accounts in New York.  (Ancone Decl., Ex. T at ¶¶ 13, 24.)

19.     Defendants opened their BLUSA accounts by meeting and interacting exclusively with Leumi (Latin America) S.A. ("Leumi Latin America") personnel, not BLUSA personnel. [Id. at ¶¶ 13, 15.].

Response:  **Disputed**.  Leumi Latin American transmitted Defendants' account opening documents to BLUSA in New York and BLUSA opened Defendants' respective accounts in New York.  (Ancone Decl., Ex. T at ¶¶ 11-13, 23-24.)

20.     Leumi Latin America's account officers did not regularly provide to each BLUSA account applicant opening documents, including the terms and conditions of the account relationship [Ganz Dep., annexed to Memorandum of Law In Support of Defendants' Joint Motion for Summary Judgment as Exhibit E, at 72:10-25; 73:1-25; 74:1-3].

Response:  **Disputed**.  The deposition testimony Defendants cite does not support this assertion.  Mr. Uriel Ganz testified as follows:  "I offer the client the possibility of having them [*i.e.*, the operative set of incorporated terms] and, generally speaking, the client doesn't want them."  (Ancone Decl., Ex. V at 73:22-74:3.)

21.     Defendants did not receive a copy of the International Account Terms during their BLUSA account opening process. [Defendants' First Decl. ¶¶ 23, 28].

Response:  **Undisputed**.

22.     The International Account Terms were not provided to Defendants at the time

5

they executed the BLUSA account opening applications or at any other time prior to this case. [Id. at ¶¶ 23, 28].

    Response:  **Undisputed**.

    23.    The International Account Terms' governing law clause was never pointed out or communicated to Defendants. [Id. at ¶ 28].

    Response:  **Disputed**.  Defendants' assertion that the "governing law clause was

never . . . communicated to Defendants" is a legal conclusion.  In addition, the Account

Applications expressly make reference to the International Account Terms, which contain the

"governing law clause."  (Ancone Decl., Ex. D at 8.)

    24.    Donald L. Bittker is a First Vice President and the Deputy General Counsel of BLUSA. [First Bittker Decl., Dkt No. 17, at ¶ 1].

    Response:  **Undisputed**, except to clarify that Mr. Bittker was First Vice President and

the Deputy General Counsel of BLUSA as of the date of the declaration that Defendants cite.

Mr. Bittker retired from BLUSA in August 2014.

    25.    Donald L. Bittker drafted the International Account Terms. [Deposition of Bank Leumi USA by Donald L. Bittker, dated June 18, 2014 ("Bittker Dep."), annexed to Memorandum of Law In Support of Defendants' Joint Motion for Summary Judgment as Exhibit D, at 21:23-24].

    Response:  **Undisputed**.

    26.    Donald L. Bittker drafted the Arrangements. [Id. 24:13].

    Response:  **Undisputed**.

    27.    The International Account Terms are dated December 2000. [See cover sheet of International Account Terms, Exhibit B to Dkt. No. 70]

    Response:  **Undisputed**.

    28.    The Arrangements are dated June 2002. [See Arrangements' cover sheet, Exhibit 3 to Dkt. No. 42; see also Bittker Dep. at 24:20-21].

    Response:  **Disputed**.  The Arrangements' cover sheet and the deposition testimony

Defendants cite do not support this assertion.  The Arrangements' cover sheet provides the following: "FORM 1336 REV 6/02."  (Ancone Decl., Ex. E at cover page.)  Mr. Bittker testified that this text means that the printing order for the Arrangements was placed on or about June 2002.  (Ancone Decl., Ex. U at 24:14-21.)

29.     Donald L. Bittker ordered the reproduction of the Arrangements on or about June 2002 [Bittker Dep. at 25:21-22].

Response:  **Undisputed**.  (Ancone Decl., Ex. U at 24:14-25:18.)

30.     The number of copies for reproduction and request for dissemination of the Arrangements were conveyed to Mr. Bittker by BLUSA's business unit. [Id. at 25:6-8; 25:21-22].

Response:  **Disputed, in part**.  The testimony that Defendants cite does not support the assertion that the "request for dissemination of the Arrangements were conveyed to Mr. Bittker by BLUSA's Business Unit."  Mr. Bittker testified only that BLUSA's business unit requested that Mr. Bittker print a certain number of copies of the Arrangements.  (Ancone Decl., Ex. U at 25:4-8.)

31.     Pursuant to its own terms, the Arrangements form supplanted the International Account Terms. [See Arrangements at section 1.1 ("Introduction")].

Response:  **Disputed**.  The section of the Arrangements Defendants cite does not support this assertion.  That section provides, in relevant part, as follows:  "This booklet is the International Financial Services Arrangements (the 'Arrangements') referred to in the International Account Application (the 'Application') and sets forth terms applicable to financial services provided through the Private Banking and International Services Division (excluding Domestic Private Banking) of Bank Leumi USA ('BLUSA')."  (Ancone Decl., Ex. E at § 1.1.)  Mr. Bittker testified that the Arrangements would govern a BLUSA-customer relationship only if the international account application that the customer signed identified the Arrangements as the

7

operative set of incorporated terms.  (Ancone Decl., Ex. U at 27:2-28:18.)  Mr. Bittker also

testified that the Arrangements would become the operative set of incorporated terms for a

BLUSA-customer relationship upon the opening of an account by BLUSA pursuant to a signed

international account application that referred to the Arrangements.   (Ancone Decl., Ex. U at

28:9-15.)  Mr. Bittker further explained that there are BLUSA-customer relationships (like

Defendants') still governed by the International Account Terms even though the Arrangements

represent the most current version of the incorporated terms.  (Ancone Decl., Ex. U at 27:23-

28:8.)  Defendants' implication that the Arrangements "supplanted" the International Account

Terms for each outstanding BLUSA-customer relationship is wrong.  (Ancone Decl., Ex. U at

28:16-18.)

32.      The Arrangements were ordered printed approximately three (3) months prior to
Defendants opening their accounts with BLUSA. [See Bittker Dep. at 25:21-22; see also
Arrangements; International Account Applications].

Response:  **Undisputed**.  (Ancone Decl., Ex. U at 24:14-25:18.)

33.      The Account Applications make reference to the International Account Terms in
fine print in English. [International Account Applications at p. 6].

Response:  **Disputed, in part**.  The Account Applications make reference to the

International Account Terms.  (Ancone Decl., Exs. A, B, C at 6.)  The text used is no smaller

than other text used in the Account Applications.  (Ancone Decl., Exs. A, B, C at 6.)

34.      Defendants' account applications do not make any reference to the Arrangements.
[See generally International Account Applications].

Response:  **Undisputed**.

35.      Between July 2002 and December 2002 BLUSA admits that account opening
applications continued to refer to the International Account Terms even though the
Arrangements had already been ordered printed and disseminated by BLUSA's Business Unit.
[Bittker Dep. at 26:21-24].

Response:  **Disputed, in part**.  The testimony that Defendants cite does not support the

assertion that the "Arrangements had already been . . . disseminated by BLUSA's Business

Unit."  Mr. Bittker testified the printing order for the Arrangements was placed on or about June

2002.  (Ancone Decl., Ex. U at 24:14-21.)

36.     BLUSA does not have the same standard applicable terms for every customer
relationship. [Bittker Dep. at 28:3-5].

Response:  **Undisputed**.  (Ancone Decl., Ex. U at 28:1-18.)

37.     Unlike the International Account Terms, the Arrangements do not point to New
York as the exclusive forum to resolve customer disputes, but also state that "legal proceedings
or actions arising of or relating to your Accounts or the Agreement may be brought in . . . the
county where you opened the Account . . . ." [Arrangements at section 1.33 ("Legal Proceedings;
Jurisdiction; Venue.")].

Response:  **Disputed**.  Defendants' assertion that the "Arrangements do not point to New

York as the exclusive forum to resolve customer disputes" is a legal conclusion.  The forum

selection clause in the Arrangements provides in full as follows:

> **1.33     Legal Proceedings; Jurisdiction; Venue.**
>
> Any legal proceedings or actions arising out of or relating to your
> Accounts or the Agreement may be brought in, and you consent to
> personal jurisdiction and venue of, any State or Federal court
> located in the county where you opened the Account, or, if you
> open the Account at the offices of a Bank BLUSA affiliate, in the
> County of New York, State of New York.  Any legal proceedings
> or actions arising out of or in relating to the Credit Account may
> also be brought in, and you also consent to personal jurisdiction
> and venue of, any State or Federal court located in the County of
> New York, State of New York.
>
> You consent to the service of process in any such legal
> proceedings or actions by mailing a copy of such process to you at
> your last known address shown on BLUSA's records.

(Ancone Decl., Ex. E at § 1.33.)  BLUSA denies Defendants' characterization of that clause, as

the plain language of the clause speaks for itself.

38.     The International Account Terms do not have a separate governing law clause.
[See generally International Account Terms].

<u>Response</u>:  **Disputed**.  The International Account Terms contains a "governing law clause," which reads as follows:  "**THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE UNITED STATES OF AMERICA**."  (Ancone Decl., Ex. D at 8.)

39.     The Arrangements have a separate governing law clause which points to Federal law, New York law, or "the laws of the State . . . where you open such account" as governing deposit accounts. [Arrangements at section 1.34 ("Governing Law")].

<u>Response</u>:  **Disputed, in part**.  The Arrangements has a "governing law clause."  That clause provides in full as follows:

> Your Deposit Account and Investment Account shall be governed by Federal law and, without reference to choice of law doctrine, to the extent not inconsistent with Federal law (i) the laws of the State (California, Florida, Illinois, or New York) where you open such account, or (ii) if you open such account through the offices of a BLUSA affiliate, the laws of the State of New York.  However, BLUSA's services as custodian, and your rights in the Assets held by BLUSA  as custodian (including any rights of those claiming through you, such as beneficiaries of an Investment Account which is an ITF Account), shall be governed by Federal law and, without reference to choice of law doctrine, to the extent not inconsistent with Federal law the laws of California.
>
> Your Credit Account shall be governed by Federal law and, without reference to choice of law doctrine, to the extent not inconsistent with Federal law the laws of the State of New York.

(Ancone Decl., Ex. E at § 1.34.)  BLUSA denies Defendants' characterization of that clause, as the plain language of the clause speaks for itself.

40.     Leumi Latin America did not produce any document that it allegedly provided to Defendants, including the International Account Terms or the Arrangements, when the bailiff of the Uruguayan Court visited their offices and requested such documents on June 28, 2012. [Declaration of Elias Bluth, dated Aug. 29, 2013, Dkt. No. 54-1 ("<u>Bluth Declaration</u>")].

<u>Response</u>:  **Disputed**.  <u>Bluth Declaration</u> ¶ 20.

41.     Leumi Latin America is controlled by a Board of Directors, which is made up

almost entirely of head executives of BLUSA. [Declaration of Richard M. Hendler in Support of Defendants' Motion to Dismiss the Complaint ("Hendler Dec.") ¶¶ 5].

> Response:  **Disputed**.  The declaration that Defendants cite does not support this

assertion because, among other reasons, Defendants merely rely on the assertions of their prior

counsel of record.

42.     Up until at least 10 years ago, Bank Leumi's representative offices in Latin America facilitated the opening of BLUSA accounts. [Bittker Dep. at 14:17-18].

> Response:  **Undisputed**, except to clarify that the representative offices referred to by

Mr. Bittker during his deposition were representative offices of "Bank Leumi le-Israel B.M." and

not the undefined entity "Bank Leumi" to which Defendants refer.  (Ancone Decl., Ex. U at

14:11-21.)

43.     Employees of Leumi Latin America signed the Defendants' account opening applications on behalf of Leumi Latin America "as a representative of BLUSA." [International Account Applications at A6, A15, A21, A27, and A37].

> Response:  **Disputed**.  The pages that Defendants cite do not support this assertion.

Specifically, the cited pages do not demonstrate that employees of Leumi Latin American signed

the Account Applications or that they contain the phrase "as a representative of BLUSA."

44.     Leumi Latin America had authority to act on behalf of BLUSA with respect to conducting the initial personal contact with a prospective client. [Bittker Dep. 16:2-12; Ganz Dep. at 27:11-19].

> Response:  **Undisputed**.

45.     Leumi Latin America was an agent of BLUSA with respect to opening accounts for BLUSA and processing clients' orders to BLUSA. [Ganz Dep. at 26:14-24; 27:11-19].

> Response:  **Disputed**.  The assertion that Leumi Latin America acted as an "agent" is a

legal conclusion.

46.     Donald L. Bittker has never visited Leumi Latin America's offices in Montevideo, Uruguay. [Bittker Dep. at 18:23-25].

Response:  **Undisputed**.

47.     Donald L. Bittker does not have direct knowledge of the account opening practices in Leumi Latin America's offices in Montevideo, Uruguay. [Bittker Dep. at 17:16; 18:25].

Response:  **Undisputed**.

48.     Between June 2002 and December 2002 BLUSA's account application made reference to the International Account Terms even though the Business Unit had already called for the printing and dissemination of the Arrangements. [Bittker Dep. at 26:21-24].

Response:  **Disputed, in part**.  The testimony that Defendants cite does not support the

assertion that the BLUSA business unit "had already called for the . . . dissemination of the

Arrangements" at anytime between June 2002 and December 2002.  The evidence in the record

does not reveal when the BLUSA business unit ordered the dissemination of the Arrangements.

49.     Donald L. Bittker has no direct knowledge of when the Arrangements were distributed to all the offices where it might be needed. [Bittker Dep. at 29:12-18].

Response:  **Undisputed**.

50.     In March, 2006, credit analysts identified Icelandic banks, including Kaupthing Bank, as too risky based on the interest premium paid given their potential for default. [Richard Thomas, Icelandic Banks: Not What You Are Thinking, Global Securities Research & Economics Group: European Credit Research, March 7, 2006, at 1.].

Response:  **Disputed**.  The record contains no evidence to support this assertion.  During

discovery, Defendants failed to produce the report they cite.  Nor did Defendants serve a copy of

this report on BLUSA as part of Defendants' summary judgment motion.  In addition, pursuant

to Local Civil Rule 56.1(d), Defendants were required to submit this report in order to rely upon

it for purposes of their motion.

51.     On November 29, 2007, Moody's reported that Kaupthing's ratings were under review for possible downgrade. [Kimmo Rama and Lynn Exton, "Moody's maintains review on Kaupthing and NIBC," Moody's Investors Service, Inc. (November 29, 2007), https://www.moodys.com/research/Moodys-maintains-review-on-Kaupthing-and-NIBC--PR_145321.]

<u>Response</u>:  **Disputed**.  The record contains no evidence to support this assertion.  During discovery, Defendants failed to produce the report they cite.  Nor did Defendants serve a copy of this report on BLUSA as part of Defendants' summary judgment motion.  In addition, pursuant to Local Civil Rule 56.1(d), Defendants were required to submit this report in order to rely upon it for purposes of their motion.

52.     On January 11, 2008, Bloomberg reported that "[t]he risk of Iceland's three largest banks defaulting soared to a record on concern that asset sales by [Kaupthing's fourth-largest shareholder] may cause losses."  [Abigail Moses, "Icelandic Bank Debt Risk Soars to Record on Asset Sale Concern," Bloomberg, L.P. (January 11, 2008)].

<u>Response</u>:  **Disputed**.  The record contains no evidence to support this assertion.  During discovery, Defendants failed to produce the report they cite.  Nor did Defendants serve a copy of this report on BLUSA as part of Defendants' summary judgment motion.  In addition, pursuant to Local Civil Rule 56.1(d), Defendants were required to submit this report in order to rely upon it for purposes of their motion.

53.     The January 2008 Bloomberg report quoted Mr. Richard Thomas, credit analyst at Merrill Lynch & Co. in London as stating: "[t]he issue on everybody's mind is the extent to which the Icelandic banks are lending to investment companies," further noting: "[t]he market is very nervous and these are vulnerable names . . .". [<u>Id.</u>].

<u>Response</u>:  **Disputed**.  The record contains no evidence to support this assertion.  During discovery, Defendants failed to produce the report they cite.  Nor did Defendants serve a copy of this report on BLUSA as part of Defendants' summary judgment motion.  In addition, pursuant to Local Civil Rule 56.1(d), Defendants were required to submit this report in order to rely upon it for purposes of their motion.

54.     On January 30, 2008, Moody's again reported that Kaupthing's ratings were under review for possible downgrade ("Moody's maintained the review for possible downgrade on the Aa3 long-term ratings and C BFSR of Kaupthing Bank . . ."). [Reynold R. Leegerstee and Kimmo Rama, "Moody's places Icelandic banks on review for possible downgrade," Moody's Investors Service, Inc., (January 30, 2008), https://www.moodys.com/research/Moodys-places-Icelandic-banks-on-review-for-possible-downgrade--PR_148539.]

<u>Response</u>:  **Disputed**.  The record contains no evidence to support this assertion.  During discovery, Defendants failed to produce the report they cite.  Nor did Defendants serve a copy of this report on BLUSA as part of Defendants' summary judgment motion.  In addition, pursuant to Local Civil Rule 56.1(d), Defendants were required to submit this report in order to rely upon it for purposes of their motion.

55.     On February 28, 2008, Moody's downgraded Kaupthing Bank, stating: "[t]hese rating actions conclude the review for possible downgrade originally initiated in August 2007 . . ." [Reynold R. Leegerstee and Kimmo Rama, "Moody's downgrades Kaupthing Bank hf to A1/C-,"  Moody's Investors Service, Inc., (February 28, 2008) https://www.moodys.com/research/Moodys-downgrades-Kaupthing-Bank-hf-to-A1C---PR_150144.].

<u>Response</u>:  **Disputed**.  The record contains no evidence to support this assertion.  During discovery, Defendants failed to produce the report they cite.  Nor did Defendants serve a copy of this report on BLUSA as part of Defendants' summary judgment motion.  In addition, pursuant to Local Civil Rule 56.1(d), Defendants were required to submit this report in order to rely upon it for purposes of their motion.

56.     On February 29, 2008, Bloomberg reported that "[t]he risk of Iceland's three largest banks defaulting on their debt soared to a record after Moody's Investors Service cut the companies' ratings, citing the 'challenging credit environment.'" [Niklas Magnusson and John Glover, "Icelandic Banks' Default Risk Soars After Ratings Cuts," Bloomberg, L.P. (Feb. 29, 2008)].

<u>Response</u>:  **Disputed**.  The record contains no evidence to support this assertion.  During discovery, Defendants failed to produce the report they cite.  Nor did Defendants serve a copy of this report on BLUSA as part of Defendants' summary judgment motion.  In addition, pursuant to Local Civil Rule 56.1(d), Defendants were required to submit this report in order to rely upon it for purposes of their motion.

57.     On March 20, 2008, Bloomberg reported that "the cost of protecting the bonds of Kaupthing Bank hf . . . against default soared to records this week amid concern Iceland's three

largest banks may be unable to fund themselves." [John Glover, "Kaupthing, Iceland Bank Default Swaps Soar Amid Funding Concerns," Bloomberg, L.P. (March 20, 2008)].

      <u>Response</u>:  **Disputed**.  The record contains no evidence to support this assertion.  During discovery, Defendants failed to produce the report they cite.  Nor did Defendants serve a copy of this report on BLUSA as part of Defendants' summary judgment motion.  In addition, pursuant to Local Civil Rule 56.1(d), Defendants were required to submit this report in order to rely upon it for purposes of their motion.

      58.    On March 27, 2008, just over one month after Leumi sold Kaupthing bonds to Defendants, Bloomberg reported that "[t]he cost of protecting Kaupthing Bank hf, Iceland's biggest lender, . . . soared to distressed levels . . ." [Abigail Moses and John Glover, "Kaupthing, Glitnir Debt Is 'Distressed,' Default Swaps Show," Bloomberg, L.P. (March 27, 2008)].

      <u>Response</u>:  **Disputed**.  The record contains no evidence to support this assertion.  During discovery, Defendants failed to produce the report they cite.  Nor did Defendants serve a copy of this report on BLUSA as part of Defendants' summary judgment motion.  In addition, pursuant to Local Civil Rule 56.1(d), Defendants were required to submit this report in order to rely upon it for purposes of their motion.

      59.    On March 28, 2008, Bloomberg reported that "[t]he risk of Iceland's biggest banks defaulting rose above 49 percent . . ." [Abigail Moses, "Iceland Bank Default Risks Rise Above 49%, Credit Swaps Show," Bloomberg, L.P. (March 28, 2008).].

      <u>Response</u>:  **Disputed**.  The record contains no evidence to support this assertion.  During discovery, Defendants failed to produce the report they cite.  Nor did Defendants serve a copy of this report on BLUSA as part of Defendants' summary judgment motion.  In addition, pursuant to Local Civil Rule 56.1(d), Defendants were required to submit this report in order to rely upon it for purposes of their motion.

      60.    On March 31, 2008, Bloomberg reported that Kaupthing Bank's risk of default had risen to an implied "59 percent risk of default within five years." [Abigail Moses, "Iceland Bank Default Swaps Rise Amid 'Unscrupulous' Speculating," Bloomberg, L.P. (March 31, 2008)].

Response: **Disputed**. The record contains no evidence to support this assertion. During discovery, Defendants failed to produce the report they cite. Nor did Defendants serve a copy of this report on BLUSA as part of Defendants' summary judgment motion. In addition, pursuant to Local Civil Rule 56.1(d), Defendants were required to submit this report in order to rely upon it for purposes of their motion.

61.      On October 1, 2008, Moody's announced it was reviewing Kaupthing Bank's covered bonds for possible downgrade. [Juan Pablo Soriano and Frederic Lelieur, "Moody's reviews Kaupthing Bank's Covered Bonds ratings for possible downgrade," Moody's Investors Service, Inc., (Oct. 1, 2008)].

Response: **Disputed**. The record contains no evidence to support this assertion. During discovery, Defendants failed to produce the report they cite. Nor did Defendants serve a copy of this report on BLUSA as part of Defendants' summary judgment motion. In addition, pursuant to Local Civil Rule 56.1(d), Defendants were required to submit this report in order to rely upon it for purposes of their motion.

62.      On October 8, 2008, Moody's again downgraded Kaupthing Bank's debt. [Reynold R. Leegerstee and Kimmo Rama, " Moody's downgrades Kaupthing; review with direction uncertain," Moody's Investors Service, Inc., (Oct. 9, 2008).].

Response: **Disputed**. The record contains no evidence to support this assertion. During discovery, Defendants failed to produce the report they cite. Nor did Defendants serve a copy of this report on BLUSA as part of Defendants' summary judgment motion. In addition, pursuant to Local Civil Rule 56.1(d), Defendants were required to submit this report in order to rely upon it for purposes of their motion.

63.      On October 9, 2008, Kaupthing Bank was seized by Iceland's government and defaulted on its debt. [Shannon D. Harrington, "Kaupthing Seizure Triggers Technical Default on Credit Swaps," Bloomberg, L.P. (Oct. 9, 2008)].

Response: **Undisputed**.

64.     Defendants purchased Kaupthing bonds in late February 2008. [Complaint at ¶ 10].

Response:  **Undisputed**.  (Ancone Decl., Exs. F, G.)

65.     Mr. Uriel Ganz, a Leumi Latin America account officer in Montevideo, Uruguay, assisted Defendants with the purchase of the Kaupthing bonds. [Ganz Dep. 54:1-24 through 57:1-16].

Response:  **Undisputed**.

66.     Defendants did not interact with any BLUSA personnel in executing the Kaupthing bond purchase. [Defendants' First Decl. at ¶ 16].

Response:  **Undisputed**, except to clarify that Defendants interacted with Mr. Uriel Ganz who was acting on behalf of BLUSA at the time to facilitate Defendants' instructions to BLUSA to purchase the Bonds.  (Ancone Decl., Ex. V at 26:19-20.)

67.     Leumi Latin America personnel called William Serrano in New York to convey bond-purchase terms agreed to by Defendants David Ehrlich and Enrique Ehrlich, including price and quantity [Ganz Dep. at 50:17-25 through 54:1-24].

Response:  **Undisputed**, except to clarify that the deposition testimony Defendants cite does not support this assertion.  Mr. William Serrano, a trader in New York at Leumi Investment Services, Inc. (the broker-dealer subsidiary of BLUSA), testified that Mr. Fernando Vidal and Uriel Ganz of Leumi Latin America conveyed Ehrlich Ehrlich's and David Ehrlichs' instructions to BLUSA to purchase the Bonds.  (Ancone Decl., Ex. U at 21:15-22:7, 26:1-17.)

68.     William Serrano executed trades in New York for Defendants based on the terms provided by Leumi Latin America personnel from Uruguay in real time. [Id.].

Response:  **Undisputed**, except to clarify that the deposition testimony Defendants cite does not support this assertion.  (Ancone Decl., Ex. W at 21:15-22:7, 26:1-17.)

69.     Defendants sent a settlement letter to Plaintiff ("Defendants' Letter") through their Uruguayan counsel Mr. Elias Bluth on March 28, 2012. [Defendants' First Dec. ¶ 19; see also Bluth Decl. at ¶ 10].

Response:  **Undisputed**.

70.     Defendants' Letter stated that Defendants wished to discuss the material dispute and reach an amicable resolution. [Defendants' First Decl. at ¶ 19].

Response:  **Undisputed**.

71.     In said letter, Defendants stated that, should Plaintiff offer no response within sixty days of the letter, Defendants reserved "the right, without additional notice, except that which may be required by applicable law, to file a Claim in any court of law and/or before any competent administrative agency […]." [Id. at ¶ 20].

Response:  **Undisputed**.

72.     BLUSA's only alleged contacts between Defendants and New York is that Plaintiff's performance under each of the agreements with Defendants occurred in New York and not in Uruguay.  [See Complaint at ¶¶ 14-17].

Response:  **Disputed**.  The complaint alleges that, during their relationship with BLUSA,

Defendants purchased many types of securities through their BLUSA accounts.  (Ancone Decl.

at ¶ 16.)  In addition, the record demonstrates that Defendants have conducted business activities

in New York by purchasing and selling at least $11 million worth of securities through those

BLUSA accounts over three years.  (Ancone Decl., Exs. H, I, J, K.)

73.     An action has been brought against BLUSA and Leumi Latin America by Defendants in Uruguay based on the same underlying dispute.  [See BLUSA's Memorandum of Law, Dkt. No. 64, n. 6; see also Bluth Declaration ¶¶ 16-18].

Response:  **Undisputed**.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

74.     On September 17, 2002, Defendants applied to open three accounts with BLUSA.

(Ancone Decl., Exs. A, B, C.)

75.     Each Defendant signed an international account application agreement ("Account

Application") in which, among other things, each acknowledged "receiving a copy of, and

agreeing to, the International Account Terms."  (Ancone Decl., Exs. A, B, C at 6.)

76.     The Account Applications were sent to New York and BLUSA opened the

accounts (the "Accounts").  (Ancone Decl., Ex. T at ¶¶ 11-13, 23-24.)

77.     The International Account Terms and the other account opening documents,

including the Account Applications, constitute the agreement ("Account Agreement") between

BLUSA and Defendants with respect to each of the Accounts.  (Ancone Decl., Ex. T at ¶ 24.)

78.     Significantly, each Account Agreement contains the following provision:

> **Governing Law; Jurisdiction; Service of Process – THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE UNITED STATES OF AMERICA.** Any legal proceeding arising from or in any way related to this Agreement may be brought in, and you hereby consent to personal jurisdiction and venue of, any state or federal court located in New York County, New York, U.S.A.  You hereby consent to the service of process in any such action, by mailing a copy of such process to you at your last known address shown on our records

(Ancone Decl., Ex. D at 8.)

79.     Also, under each Account Agreement, BLUSA was "authorized to acquire in

[BLUSA's name], but for the benefit of [Defendants'] Investment Account[s] and at

[Defendants'] sole risk, the Assets selected by [Defendants] from time to time."  (Ancone Decl.,

Ex. D at 17 (§ 23(b)).)

80.     Defendants maintained the Accounts for about nine years, until 2011.  (Ancone

Decl., Exs. H, I, J.)

81.     Over three of those years, Defendants purchased and sold at least $11 million

worth of securities in at least 59 transactions in these Accounts.  (Ancone Decl., Exs. H, I, J, K.)

82.     On or about February 21, 2008, Defendants signed order forms instructing

BLUSA to purchase $750,000 worth of the Kaupthing Bank bonds ("Bonds").  (Ancone Decl.,

Exs. F, G.)

83.     BLUSA's affiliate, Leumi (Latin America) S.A., transmitted the instructions on

the order forms (which are addressed"[t]o Bank Leumi USA") from Uruguay to BLUSA in New York.  (Ancone Decl., Ex. T at ¶¶ 15, 37; Ancone Decl., Ex. V at 37:5-45:10.)

84.     That same day, Mr. William Serrano, a trader employed by BLUSA at the time, executed the trades via Bloomberg while in BLUSA's trading room located in New York. (Ancone Decl., Ex. W at 20:3-22:25; 30:20-32:17.)

85.     Mr. Serrano purchased the Bonds from Credit Suisse on behalf of Defendants, and BLUSA deposited them into Defendants' Accounts in New York.  (Ancone Decl., Ex. T at ¶ 39; Ancone Decl., Ex. W at 35:9-23.)

86.     In addition to opening BLUSA accounts in New York, on or about October 11, 2002, Defendants opened a similar investment account with Bank Hapoalim, B.M. through its New York branch.  (Ancone Decl., Ex. L.)

87.     Defendants have maintained this account for at least eleven years and have purchased and sold various securities through this account.  (Ancone Decl., Ex. M.)

88.     On June 5, 2012, BLUSA filed this declaratory judgment action in this Court pursuant to the mandatory forum selection clause in the Account Agreements.  (Ancone Decl. ¶ 16.)

89.     On July 23, 2012, Defendants moved to dismiss the complaint arguing that: (i) this Court lacks jurisdiction over Defendants under contract or pursuant to New York's long-arm statute; (ii) venue in New York is improper; and (iii) New York is an inconvenient forum. (Ancone Decl. ¶ 17.)

90.     The Court denied Defendants' motion.  In a February 19, 2013 order ("Order"), the Court concluded that the New York forum selection clause is "presumptively enforceable," and that Defendants "failed to rebut that presumption."  (Ancone Decl., Ex. N at 16.)

91.     The Court held that Defendants are "bound by the terms of the forum selection clause," specifically, that they "consented to both personal jurisdiction and venue in the Southern District of New York."  (Ancone Decl., Ex. N at 16.)

92.     The Court also rejected Defendants' argument that New York was an inconvenient forum.  (Ancone Decl., Ex. N at 16-21.)

93.     Critically, the Court held that BLUSA's choice of forum in New York is "entitled to very strong deference" because:

> (i) BLUSA is the plaintiff in this action and it brought suit in its home forum;[] (ii) Defendants are amenable to service of process in New York, having expressly consented to service of process in the forum selection clause; (iii) [BLUSA] chose this forum for legitimate reasons – this is BLUSA's home forum, it is the forum listed in the forum selection clause, it is the situs of the underlying transactions on BLUSA's end, and the contract is governed by the laws of New York; and (iv) there is nothing to suggest that this Court will not be able to provide adequate legal assistance in resolving this matter

(Ancone Decl., Ex. N at 18-19.)

94.     Given this strong deference and the fact that Defendants did not argue that any of the public interest factors militated in their favor, the Court rejected Defendants' argument that the private interest factors set forth in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) alone warranted dismissal.  (Ancone Decl., Ex. N at 21.)

95.     The motion having been denied, the Court directed the parties to confer and submit a proposed case management plan and scheduling order to govern the remainder of the case and scheduled an initial pretrial conference.  (Ancone Decl., Ex. N at 22.)

96.     Defendants did not participate in a meet-and-confer and they failed to submit these items by the Court-imposed deadline.  (Ancone Decl., Ex. O.)

97.     Defendants were also required to answer the complaint, but they did not.

(Ancone Decl. ¶ 18.)

98.     Instead, Defendants' counsel moved to withdraw.  (Ancone Decl., Ex. P.)

99.     The Court granted the motion and allowed Defendants time to find replacement counsel or inform the Court whether they intended to proceed *pro se*.  (Ancone Decl., Ex. P.)

100.    The Court cautioned Defendants that failure to abide by the order "could result in adverse action, including entry of default judgment against them[.]"  (Ancone Decl., Ex. P.)

101.    Defendants informed the Court in a declaration that they could not afford replacement counsel and had no intention to participate further in this action.  (Ancone Decl., Ex. Q at 2, 4.)

102.    Defendants explained that they would, instead, continue to litigate the claims that they had filed against BLUSA in Uruguay in mid-2012.  (Ancone Decl., Ex. Q at 4.)

103.    On June 18, 2013, BLUSA obtained entries of default for each of the Defendants and, on June 19, 2014, moved for a default judgment against them.  (Ancone Decl. ¶ 22.)

104.    Days before the deadline to oppose BLUSA's default judgment motion, on July 22, 2014, Defendants suddenly re-appeared in the case with new counsel and filed what amounted to an untimely motion for reconsideration of the Order in an effort to stave off entry of a default judgment.  (Ancone Decl. ¶ 23.)

105.    Defendants argued that the International Account Terms did not govern their relationship with BLUSA because those terms were purportedly superseded by a different set of incorporated terms called the International Financial Services Arrangements ("Arrangements").  (Ancone Decl. ¶ 23.)

106.    In light of this assertion, the Court vacated the entries of default but declined to revise its Order and directed Defendants, once again, to answer the complaint.  (Ancone Decl.,

Ex. R at 5.)

107.    The Court also noted "its concern with the course of litigation[.]"  (Ancone Decl., Ex. R at 5.)

108.    On March 4, 2014, now 21 months since the complaint was filed, Defendants finally filed an answer and asserted various counterclaims.  (Ancone Decl. ¶ 24.)

109.    The parties then agreed to a scheduling order and engaged in discovery.  (Ancone Decl. ¶ 24.)

110.    In total, the parties conducted six depositions, including the depositions of Defendants Enrique Ehrlich and David Ehrlich, and exchanged thousands of pages of documents. (Ancone Decl. ¶ 24.)

Dated:  September 15, 2014
       New York, New York

                        MAYER BROWN LLP

                        By:    /s/ Mark G. Hanchet

                              Mark G. Hanchet, Esq.
                              James Ancone, Esq.
                              1675 Broadway
                              New York, New York 10019
                              Tel:  (212) 506-2500
                              Fax: (212) 262-1910

                              *Counsel for Plaintiff Bank Leumi USA*

## <u>CERTIFICATE OF SERVICE</u>

I, James Ancone, an attorney, hereby certify that, on September 15, 2014, I caused true and correct copies of the foregoing document to be sent to Defendants' counsel of record via ECF and at the following email address:

Jose Raul Alcantar Villagran, Esq. (JA2849)
ALCANTAR LAW PLLC
22 Cortlandt Street, 16th Floor
New York, New York 10007
Tel: (212) 658-0222
Fax: (646) 568-5843
raul.alcantar@alcantarlaw.com
*Attorneys for Defendants*

Dated:     September 15, 2014
           New York, NY

                                        By:     /s/ James Ancone
                                                James Ancone